### BROWN AND BROTHERS *vs.* CHARLES ILLIUS.

The plea of the general issue is a waiver of all objections to the person of the plaintiff and admits his capacity to sue in the action.

Under that plea, therefore, the corporate character of a plaintiff suing as a corporation is not in issue.

Whether, under the act with regard to joint stock corporations, the capital stock of such corporations must be paid in in cash, or may be paid in property necessary for the business of the corporation : *quere.*

In the cases where the negligence of the complainant is a complete legal excuse for that of the defendant, the injury is the product to some extent of the co-operation of causes set in motion by both parties and due in some degree to their combined negligence.

Where, therefore, by the negligence of the defendant, noxious gases were generated in his business and allowed to escape upon the adjoining premises of the plaintiff, rendering them unwholesome, it was held to be no defence that the plaintiff, by the negligent management of his own business, produced other noxious odors on his premises which contributed to render them unwholesome, it not appearing that the odors from the defendant's premises acquired their noxious character from the combination, or that they were not independent in their operation.

Where a party negligently leaves noxious substances on his land, which are washed by the rain along the surface of the ground into his neighbor's well, corrupting the water, he is liable for the injury.

And it makes no difference whether the noxious substances are carried upon the surface of the ground, or have soaked into the soil and are carried along under the surface by means of water diffusing itself according to natural laws.

But where such noxious substances by penetrating or being buried within the soil, have affected subterraneous currents by which such well is supplied,

Brown & Brothers *v.* Illius.

and have corrupted the water only in that mode, the party placing such substances on or within his soil, is not liable, unless he has acted maliciously.
And it makes no difference that he has been notified of the injury and could prevent it by the use of reasonable care. (Ellsworth J. dissenting.)
Subterraneous currents of water are not subject to the same rules of law in respect to the rights of parties to their undisturbed flow, as streams above the surface. In the absence of a right specially acquired, the owner of the soil through which such a current passes has no such property in it that he can maintain an action for its diversion or disturbance.

ACTION on the case for a nuisance, tried to the jury on the general issue.

The plaintiffs, who were a corporation by the name of Brown and Brothers, owned and conducted an extensive manufacturing establishment in the town of Waterbury, having on their premises a large well which supplied water for a steam engine and for the use of their workmen. The defendant owned a contiguous lot, on which he had erected gas works, in close proximity to the buildings and well of the plaintiffs, at which he manufactured gas in large quantities. The plaintiffs in their declaration alleged and on the trial offered evidence to prove, that noxious stenches arising from the manufacture of gas by the defendant penetrated their mill, rendering the same uncomfortable and unwholesome, so that their workmen could not labor therein; and that the defendant negligently and improperly placed upon the surface of his lot, along the line of the plaintiffs' land near their well, large quantities of coal tar, gas lime, and other offensive and noxious materials used in or resulting from the manufacture of gas, which were washed by the surface water into the well, and also soaked and penetrated into the ground and thence into the soil around and adjoining the well and into the well, whereby the water therein was corrupted and rendered permanently unfit for drinking purposes and ablution, and for the use of their steam engine.

The defendant claimed, and offered evidence to prove, that the plaintiffs, in the manufacture upon their premises of brass, copper, zinc and other metal wares, negligently permitted large quantities of offensive and poisonous gases to escape

and pervade their buildings, and that their premises were rendered unwholesome thereby, and not by the noxious gases from the works of the defendant; and asked the court to charge the jury, that even if he had by negligence caused some injury to the plaintiffs by stenches from his gas works, yet that if the plaintiffs, by the want of ordinary care on their part, had by their own gases contributed in any substantial degree to produce the injury complained of, they could not recover. The plaintiffs however did not claim to recover for any injury but such as they had received from the defendant's gas works alone. Upon this claim of the defendant the court omitted to give the jury any instruction.

It was admitted that, soon after the water of the well began to be corrupted, the plaintiffs gave notice of the fact to the defendant.

The defendant claimed that he had a right, as the lawful proprietor of his land, to erect gas works thereon, and use the same for the purpose of manufacturing gas, and also to place refuse material connected with the business upon his land, and claimed that he had proved that whatever damage had accrued to the plaintiffs' well, resulted from the proper and lawful use of his premises, and that the gas materials deposited upon the surface of his lot, had penetrated the ground and mixed therewith, and with the waters therein, and became a part thereof, and by filtration, percolation, capillary or chemical attraction, or some unknown and uncontrollable agency, had been carried into the plaintiffs' well, and thus injured the same; and requested the court to charge the jury that in placing the materials upon his own soil, without malice, he was bound to exercise no care in view of their combining with the earth and the water therein, and by the agencies before mentioned being carried into the land of the plaintiffs and corrupting the water of their well.

The court instructed the jury as follows: " A nuisance signifies anything that worketh hurt, inconvenience or damage to another. This is a general definition. But when we speak of the liability of a man for erecting or maintaining a nuisance, it does not follow that whatsoever worketh hurt, in-

Brown & Brothers *v.* Illius.

convenience or damage to another, is a nuisance for which an action will lie. Injuries are sometimes produced in the carrying on of lawful business, to which the law applies the maxim "*damnum absque injuria*," a loss without an injury, meaning an injury without legal redress. Whether the maxim will apply in a particular case, depends upon the circumstances of the particular case.

"Suppose a man, desirous of carrying on the business of manufacturing gas, should locate his establishment a half a mile out of town, for the purpose of avoiding all danger of detriment to others. A place is selected where a prudent man, well versed in the business, acquainted with the nature of the deleterious substances that such an establishment produces, with knowledge how far they would be likely to infest the neighborhood, either above, along, or under the earth, would say that such an establishment could be located and the business carried on without detriment to the person or property of any human being. After the establishment had been erected at great expense and the business carried on for a season, it is found that the noxious substances from the manufactory have filtered through the earth, and corrupted an under ground water course leading directly to the town and supplying many wells there, by means of which they have become corrupted and spoiled. In such a case, I think there could be no question that the owner of the establishment would not be responsible for the mischief, especially before he has knowledge of the fact. After he has such knowledge, if by the exercise of reasonable care in the use of reasonable means, a continuance of the mischief could be prevented, I think he would be bound to exercise such care and use such means; but not otherwise.

"You will inquire by what mode the well became affected; whether the noxious substances filtered through the earth to the well, in consequence of ordinary rains, in the usual mode for the spreading of such substances, without corrupting the underground water course that supplied the same; or whether they filtered through the earth and corrupted the underground water course that supplied the well, and in that mode,

and that only, spoiled the same. If the well was corrupted in that mode, it is difficult to see how the defendant could be guilty of negligence in corrupting the same. He had no means of knowing that the water course was there. No prudence could guard against such a result, and without negligence the defendant would not be liable. He could not be liable for corrupting streams under the ground, of the presence of which he had no knowledge or means of knowledge; and in relation to water in combination with the earth, he would not be liable for corrupting it under any circumstances. The defendant was bound to guard against the spreading of such noxious substances in the usual and ordinary mode of the spreading of the same. But the plaintiffs claim that soon after the mischief began to the well, they complained to the defendant respecting it. This is not denied by the defendant. You will then inquire whether the exercise of such care as I have described would have prevented a continuance of the mischief. If it would, the defendant was in fault that he did not exercise such care, providing he did not, and for the injury resulting from such neglect, (if any,) he is responsible."

The plaintiffs claimed to be a corporation, organized under the general statute with regard to joint stock corporations, and in proof of their corporate character laid in a copy of the certificate filed according to law in the office of the town clerk of the town of Waterbury, where the corporation was located. In this certificate it was stated that the capital stock of the corporation was $200,000, all of which was paid in. It was admitted by the plaintiffs that the capital stock was paid in wholly by a transfer to the corporation of certain real and personal estate belonging to the firm of Brown & Brothers, all of whose members became stockholders of the corporation. And it was proved by the plaintiffs, and no evidence to the contrary offered by the defendant, that all the property so taken was necessary and proper for the prosecution of the business for which the corporation was formed, and without which or other like it, they could not have carried on the same, and was taken at a lower valuation than

they could have procured the same for cash. The defendant thereupon claimed that the certificate was false in fact, and that the plaintiffs were not duly organized under the statute, and claimed that the court should so charge the jury. The court instructed them, that if they should find that all the property transferred by the co-partnership of Brown & Brothers to the plaintiffs when the corporation was formed, was of the full value of the capital stock of the corporation, and was necessary for the successful prosecution of the business of the corporation, so necessary that had the capital been paid in in money it would necessarily have been expended in the purchase of this property or of other property of a like character, then the plaintiffs would not be prevented from being duly incorporated by the fact that the capital was not paid in in money.

The jury rendered a verdict for the plaintiffs, and the defendant moved for a new trial.

*Blackman* and *Webster*, in support of the motion.

1. The plaintiffs were not legally organized as a corporation. Rev. Stat., tit. 3, §§ 195, 196, 210. *Mechanics Mutual Sav. Bank* v. *American Agency Co.*, 24 Conn., 159. Ang. & Ames on Corp., § 88.

2. The plaintiffs can not recover if their own negligence contributed to produce the injury of which they complain. This principle is asserted by all the cases on the subject, from the leading case of *Butterfield* v. *Forester*, 11 East, 60, down to recent decisions in our own court. The principle is applicable to the present case, and the court erred in refusing to charge the jury on the subject as claimed by the defendant.

3. The court erred in charging the jury that the defendant was liable after notice for any injury to the well of the plaintiffs caused by corrupting the underground currents that supplied the well, if by reasonable care the injury could have been prevented. The claim of the defendant on this point was correct. Such a damage is *damnum absque injuria.* The defendant was not bound to use any care to prevent such damage, and notice can not affect him. *Acton* v. *Blundell,*

12 Mees. & Wels., 324. *Roath* v. *Driscoll*, 20 Conn., 533. *Greenleaf* v. *Francis*, 18 Pick., 117. *Greatrex* v. *Hayward*, 20 Eng. L. & Eq. R., 377. *Rawstron* v. *Taylor*, 33 id., 428. *Broadbent* v. *Ramsbottom*, 34 id., 553. *Wheatley* v. *Baugh*, 25 Penn., 528.

*R. I. Ingersoll* and *N. J. Buel*, contra.

1. The instruction of the court upon the claim of the defendant that the plaintiffs were not legally organized as a corporation, was correct. It is not necessary that the capital should have been paid in in cash. The language of the certificate does not necessarily imply it. Besides, the defendant can not avail himself of this objection under the general issue. By that plea he admits the character in which the plaintiffs sue.

2. If the plaintiffs suffered annoyance from gases produced by their own works, it furnished no excuse for the defendant in annoying them with noxious odors from his works. They claimed to recover only for injuries resulting from the stenches from the defendant's works. The jury so understood it, and must have made the proper discrimination. The principle which prevents a recovery by a party whose negligence has concurred with that of the defendant in producing the injury of which he complains, has no application to the present case.

3. The instructions of the court as to the liability of the defendant for corrupting the currents of water that supplied the well of the plaintiffs, and as to the effect of notice, and the duty of reasonable care after notice, were correct. *Brown* v. *Illius*, 25 Conn., 583, 591. *Bellows* v. *Sackett*, 15 Barb., 96. *Parker* v. *Boston and Maine R. R. Co.*, 3 Cush., 114. *Dickinson* v. *Grand Junction Canal Co.*, 9 Eng. L. & Eq. R., 521. *Wheatley* v. *Baugh*, 25 Penn., 528.

STORRS, C. J. As to the first question made on the trial, respecting the existence of the plaintiffs as a corporation, that was a point which it was not competent for the defendant to avail himself of under the general issue. The objection should have been taken by a plea in abatement. The plea of the general issue is a waiver of all objections to the

person of the plaintiff, and admits his capacity to sue in the action. *Phœnix Bank* v. *Curtis*, 14 Conn., 437. As it would therefore avail nothing to the defendant on another trial, even if the court below decided incorrectly respecting the organization of the plaintiffs, (which we would not intimate, being strongly inclined to the opinion that there was no error on that point,) it is unnecessary to examine the question made on that subject.

The defendant requested the court to charge the jury that the plaintiffs could not recover for the injury complained of, if through want of ordinary care on their own part and by reason of their own gases they contributed in any substantial degree to produce it, although the defendant through negligence caused some injury to the plaintiffs by foul odors from his works. This request implied that the injury might have proceeded from the commixture or combined chemical effect of the different exhalations generated by the operations of the two parties. Otherwise the plaintiffs could not have "contributed" to the precise inconvenience which was caused by the defendant; for, until some union was produced, each gas must have had its peculiar and independent effect. A distinct inconvenience might have resulted to the plaintiffs from each, but it would not be reasonable that the plaintiffs should fail to recover for one annoyance because they suffered at the same time a similar injury from another source. Nothing in the motion indicates, as far as its confused expression will enable us to decide, that the effect of each party's gases was not totally independent of those of the other and clearly distinguishable to the jury upon the evidence; so that they awarded damages for those injurious consequences only, which were traceable to the defendant's works. At all events, the motion discloses no facts which make it clear or even probable that, at the trial below, the effect of the combination of the gases was either proved or suggested by the evidence. If not, then the plaintiffs could not, in any just sense, be chargeable with contributing to the particular injury which originated with the defendant. The latter's works would not be made noxious

in the smallest degree by those of the plaintiffs, although the latter were as noxious as the defendant claimed them to be. In those cases where the negligence of the complainant is a complete legal excuse for that of the defendant, we always find that the injury is the product, to some extent, of the co-operation of causes set in motion by both parties, and is due in some measure to the combined negligence of both. As it is not for us to presume that claims were made, or that facts appeared at the trial, not now revealed by the record, we must sanction the refusal of the court below to charge according to the defendant's request; for it is never the duty of a judge to give instructions upon any point not fairly arising upon the evidence adduced.

The remaining question respects the correctness of the charge below in relation to the liability of the defendant for the consequences of his placing noxious substances on his land, so as to be washed and carried therefrom by rains into the plaintiffs' well and corrupting it.

We assent fully to the principle laid down in the charge, that if such substances were, by means of rain, washed and carried into the well along the surface of the ground without soaking at all into it, or if, although not carried literally on the very surface, that is, the top of the ground and outside of it, they soaked into it, and were thence spread and diffused laterally towards the plaintiffs' land, and found their way into the well, without mingling with any of the underground streams or currents of water by which the well was fed and supplied, and the well was thereby and in such manner alone corrupted, the defendant was guilty of an invasion of the rights of the plaintiffs and liable for its consequences. The case would then rest upon the same principle as that which would apply to a pig-sty, slaughter-house, tannery, steam-engine, smith's forge, &c., by the vapors, smells, or noises from which the dwellings in their neighborhood or their occupants are injured or rendered unhealthy or uncomfortable. The principle is not to be varied because, in this case, the land of the neighboring owner was affected beneath its sur-face rather than upon it, or because the injury was produced

by substances carried to it, not altogether by water running on the surface, but more or less by water spreading and diffusing itself according to natural laws under the surface, so as to reach and penetrate the adjoining land. Nor would it be material whether the injurious consequences were produced in the air or in the earth. Gas-works, supposing the smell from them to affect injuriously the health or comfort of those living in their vicinity, would become an actionable nuisance. Their effect would be through the medium of the air solely. Would any one contend that, if a person should cause gas to be conveyed beneath the surface of his land so carelessly or unskillfully that it thence escaped from the pipes, and by its own force spread and diffused itself upon or through the land of an adjoining owner, and by its deleterious qualities affected the roots of his trees so as to kill them, or the adjoining land so as to destroy or prevent vegetation, an action would not lie for such an injury because it was done within the ground? The defendant therefore cannot justly complain of this part of the charge, which respects only an injury to the plaintiffs' well in consequence of the particles of the noxious substances being washed into it from the defendant's land by means of rain, whether on or under the surface of the ground, so long as they were carried directly by the mere agency or natural action of the water itself falling upon those substances, and not by means of its mingling or uniting with subterraneous streams or currents of water on the defendant's own land, which supplied the well, so that the particles were by these streams transmitted into it.

We would also express our concurrence with the judge below in that part of his charge in which he instructed the jury that if, in this case, the water falling upon the noxious substances on the defendant's land sunk into the ground and carried with it those substances and became commingled with subterraneous streams or currents, and they were by such streams or currents alone transmitted to the plaintiffs' well, and it was corrupted in this mode, there would be no violation by the defendant of the legal rights of the plaintiffs, and therefore the latter, for any damage so occasioned, could

not recover. As this ruling was in favor of the defendant, he could not, for that reason alone, complain of it if it were erroneous. But, that there may be no question respecting it on the re-trial of this case, we have deemed it proper thus to express our opinion upon it. We consider this point to have been fully settled by the cases of *Acton* v. *Blundell*, (12 Mees. & Wels., 324,) *Roath* v. *Driscoll*, (20 Conn., 533,) and *Greenleaf* v. *Francis*, (18 Pick., 117.) It is established in these cases, that the rule of law which applies to and regulates water-courses flowing on the surface of land, is not applicable and does not govern the right to the enjoyment of underground springs, or of a well supplied by such springs, and that therefore the owner of land through which water flows in a subterraneous stream or current has not, in the absence of an artificial property in it, acquired by him by grant or adverse possession, any right or interest in it which will enable him to maintain an action against another land-owner who, by digging a well on his land or carrying on business on it in the usual manner, without a malicious intent, drains away the water from the first mentioned owner and lays his well dry. The principle upon which these cases, which are similar in their circumstances, were decided, is fully and explicitly stated by Tindal, C. J., in his opinion on the case of *Acton* v. *Blundell*, in which, after mentioning that the court intimate no opinion as to what might be the rule of law if there had been an uninterrupted user by the plaintiff of the right claimed by him for more than twenty years, (the time of prescription by the English law,) he says : "We think the present case is not to be governed by the law which applies to rivers and flowing streams, but that it rather falls within the principle which gives to the owner of the soil all that lies beneath its surface ; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil, part water ; that the person who owns the surface may dig therein and apply all that is there found to his own purposes at his free will and pleasure ; and that if, in the exercise of such right, he interrupts or drains off the water collected from underground

springs in his neighbor's well, this inconvenience to his neighbor falls within the description of *damnum absque injuria,* which can not become the ground of an action." *Greenleaf* v. *Francis* was decided on substantially the same ground, as appears from the opinion of the court, and the same doctrine was recognized and adopted by this court in *Roath* v. *Driscoll.* Applying the principle established in these cases with regard to subterraneous streams and currents to the case before us, it seems very obvious to us that the plaintiffs could no more complain of the inconvenience to them caused by the particles of the noxious matter deposited on the defendant's land being carried by the rains into the subterraneous currents or streams beneath it and thence into the plaintiffs' land and well, than they could if the defendant had dug a well on his own land and thereby dried up a well on that of the plaintiffs. His ownership of the land sanctioned and justified the use he made of it, and protected him against the consequences of such use, although attended with damage to the plaintiffs, so far as those consequences depended on or resulted from the operation of subterraneous streams or currents through his land. In regard to such streams or currents there is not, to adopt the mode of expression of one of the counsel in *Acton* v. *Blundell,* any *jus alienum* on the part of the owners of other land, and therefore the maxim *sic utere tuo ut alienum non lœdas,* does not apply. We do not pursue this point further, because we do not understand that it is questioned by either of the parties in this case. The court below, however, as we understand the charge, instructed the jury that if the water on the defendant's land, with the impurities it had imbibed from the noxious substances placed on it, filtered through his land and mingled with underground streams in it below that supplied the plaintiffs' well, and was carried by those streams into it, although he would not be liable for these consequences in the first instance, he would be liable for a continuance of the mischief after being notified by the plaintiffs of its existence, if he did not thereupon use common, ordinary and reasonable care to prevent it. Here we think there was error. The

defendant had a lawful right to use his land for the purpose of depositing thereon the substances which he placed there, and, as has already been stated, is not liable for the damage which the plaintiffs might sustain by reason of those substances being carried by the rain into the subterraneous streams beneath and thence by them into the well, because damage sustained from such a cause is *damnum absque injuria,* a damage without any violation of the plaintiffs' right. The plaintiffs had no right to require that the defendant should not inflict or suffer to be inflicted a damage by those means, and therefore the defendant was under no legal obligation to prevent it in the first instance, or a continuance of it afterwards. All that the defendant had done was lawful, so far as it depended on consequences of that description, and hence for those consequences he was not answerable. Such an inconvenience, in the language of Ch. J. Tindal already quoted, " falls within the description of *damnum absque injuria,* which can not become the ground of an action." If then, the act of the defendant was lawful notwithstanding the consequences occasioned in the manner mentioned by means of underground streams, it certainly was not the duty of the defendant to endeavor to avert them. If it were, the defendant had not a right to do, or rather to continue to do, a lawful act, which is a solecism. On a question of negligence in doing a thing which is actionable only if done negligently, notice to the person doing it may be very material and proper where it is claimed to have been wrongfully or maliciously continued after such notice ; but we cannot understand how a person can be placed under a legal obligation not to do what the law gives him a right to do, by a request or complaint on the part of another person, damnified indeed by it but to whom it is not a legal injury. On this point we think the defendant is entitled to a new trial. In a former case between these parties, similar in its circumstances to the present, which was decided by us the last year, (25 Conn., 583,) we did not consider it necessary to decide this question, because, although a similar ruling was made in that case in the court below, it appeared from the motion for

a new trial, (which was on the ground that the verdict was against the evidence, and in which the evidence was of course detailed,) that the question was not really involved in the case, and was therefore merely speculative in its character. As it does not however appear on the present motion, which is founded only on errors in the charge below, that the verdict did not turn on the point which we have reviewed, it has become necessary to decide it.

A new trial is advised.

In this opinion Hinman, J. concurred.

ELLSWORTH, J.  This is the same case in substance as that of *Brown & al.* v. *Illius*, 25 Conn., 583, in which I expressed my views of the principles of the law upon a charge similar to the present one; but as the subject is again brought before us for examination, and has been elaborately discussed, I will add somewhat to the views I then expressed.

No maxim of the law is more universally received, and acknowledged to be founded in a more obvious necessity, than that every man may possess and enjoy what is his own, which maxim, when applied to real estate, means that the owner of the soil may appropriate to his exclusive use the surface, and the space above and beneath to any possible height or depth. But there is a correlative maxim not less acknowledged, and founded in as obvious a necessity, that upon this surface and below or above, the owner may not do any thing which produces an unnecessary injury to the land of his neighbor. Both are entitled to the same protection, for both own alike their land, and hence both must exercise their rights subject to the foregoing principle of law; nor is there any difficulty in harmonizing these respective rights. And here I remark, that no notion is more unfounded or repugnant to our social obligations, than that the owner of land has an absolute right to do with it according to his interest and pleasure, unrestricted by his relations to others,— or that the purpose and mode of using one's own does not enter into and qualify the right itself in particular cases. *Sic utere*

*tuo ut alienum non lædas*, is a maxim as old as the common law, and in its principle far older, for it is the moral law of God, and is binding everywhere and on every man. In the application of it, courts have decided that in some places the owner of land can not put it to certain uses at all, as for instance, that he may not erect upon it a pig-sty, a slaughter-house, a tannery, a tallow-furnace, a steam-engine, or smiths-forge, and the like, which in their use will infect the air, produce unhealthy vapors or offensive smells or noises so near dwellings as materially to affect them and render them unhealthy or uncomfortable as residences. They are nuisances of course. Gas works are classed in this list by some distinguished judges and in some respectable courts, and all will agree that they may become nuisances and be properly enjoined against if not so managed as not to be injurious to the adjoining owners.

We find then, that there is a restriction and qualification affixed to the enjoyment of land which must be observed and enforced in every well regulated community.

But it is asked shall not the proprietor have and enjoy his own land and all that is below or within it? Certainly he may. But what is his own? A question that is best answered by inquiring what are the correlative rights of others, which is the true question to be settled, and constitutes the entire case before us. I will endeavor to answer it.

We say then, that the owner has an exclusive right to the possession and the usual, necessary and reasonable use of his land and whatever is upon or within it, air, earth, buildings, stones, minerals, vegetation and water. In a sense, he may put them to any use he pleases, having due regard to the consequences which may flow from such acts as reach in their effects beyond his premises. Within his premises he is absolute owner, but beyond and without them he has no ownership at all, nor has he a right to affect others except so far as it is incidental to the possession and equal enjoyment of what is his own. He must conduct his business with ordinary care and prudence, and may exact as much and no more from others. Some things he may not do at all, such as pur-

suing the avocations I have mentioned; other things he may do, conducting, as I have said, with ordinary care and prudence.

To apply this rule. The legal obligations of Mr. Illius are, that, as to the plaintiffs' business and premises, he shall occupy and enjoy his lot and gas works in a reasonable manner; and to determine what is a reasonable manner, we must take into consideration the nature of the business, the manner and place where it is carried on, the materials used, and especially the natural effect of the elements upon such materials exposed and accumulating on the defendant's land near the well of the plaintiffs. These all must be considered, because they underlie and surround the occupancy and use, and give to them their legal complexion and character. To exclude them would be to veil the subject from the only light by which its reasonableness or unreasonableness can be perceived; for to determine what is reasonable we must know the attending circumstances. While a man is not answerable in damages for the consequences of enjoying his property in the way in which such property is usually enjoyed, or while conducting a lawful business with care and prudence, he is liable if the reverse be true and special damages result. What is reasonable, must, as we have said, be ascertained, not by any arbitrary use of that word, but from a careful attention to the facts and circumstances and necessities of the particular case. In *Carhart* v. *Auburn Gas Light Company*, 22 Barb., 300, the court held that gas works are to be placed in the class of erections which are not within the ordinary and usual purposes to which real estate in cities is applied, and that whenever they create a special injury they are to be regarded as a private nuisance.

If then, in the present case, as was claimed by the plaintiffs, the defendant suffered his land and water unnecessarily to be corrupted and spoiled by the accumulation and exposure of filthy materials on the surface, and from thence, after notice, he allowed this water as it accumulated from rains and snows to penetrate the plaintiffs' land and well and render them useless for necessary purposes, is it material to inquire just how this poisonous filth passed, whether by per-

colation, (which Webster defines as "straining, filtering, passing through small interstices,") or by soaking and spreading, (the same thing,) or in subterraneous currents and streams connected with the sources of the well.   The injury and its causes can not be said to be unknown and secret, nor is the exact mode and manner of operation important, for the injury in both cases is direct and immediate, and knowledge would be implied, as every man must be held to know the natural and ordinary consequences of his actions.   But the implication is not necessary here, for knowledge is brought home to the defendant.   I say then, the mode is not the material inquiry, but the communication itself.   Does that exist, and is it attributable to the defendant's negligence and misconduct?   If so, all other distinctions are speculative and useless.   Now to establish the position that such a communication is a nuisance, we have only to recur to what makes it a nuisance at all, when foul water is permitted to accumulate upon and within one's land and pass thence by percolation or soaking into a neighbor's well.   In both cases the injury is direct, and traceable to the defendant's negligence and misconduct.

We do not attach vital importance to the motive with which a rightful thing is done, if only the person doing it keeps within the proper and legal exercise of his right; but then his motives have an important bearing upon the question of the proper exercise of the right under the particular circumstances; and hence knowledge of the consequences of certain neglect or misconduct may prove that the negligence is improper and furnishes a cause of action.   In *Roath* v. *Driscoll*, 20 Conn., 533, the present chief justice, who had tried the case below, thought it important to negative the defendant's making his well "for any improper or unnecessary purpose or with any malicious or evil intention towards the plaintiffs, for the purpose of injuring them." So in *Acton* v. *Blundell*, Tindal, C. J. says that the judge on the circuit laid down the true rule, " that if the defendant had proceeded and acted in the usual and proper manner on the land for the purpose of working a coal mine therein,"

he would not be liable. In the case of *Greenleaf* v. *Francis,* 18 Pick., 117, the court say, " the right in question should not be exercised from mere malice."

The rule is never made to depend on the mode of the nuisance, that is, by water percolating and running below the surface, or running or soaking on the surface. Knowledge accompanying negligence in the exercise of one's right removes all ground of difference, and the wrong and nuisance must be the same in both cases.

Now, my brethren admit, if I understand them, that if water passes over and from the noxious substances into the plaintiffs' well by soaking or percolation, irrespective of the depth below the surface, it may be a nuisance, but the moment it strikes subterraneous streams and water courses, and mingling with them flows into the plaintiffs' well, it can not be a nuisance, let there be never so much negligence, and knowledge, or even wantonness in the use of the supposed right, and let the injury be never so direct, unnecessary and aggravated. If I understand my brethren aright, I must humbly express my dissent to their doctrine. To show its unsoundness, it seems to me that we need only to inquire wherein it is a nuisance in any case for a man to allow foul water to accumulate on his premises, and pass thence into his neighbor's well by soaking or percolation.

But it is said, this distinction is recognized in three of the cases cited by the defendants' counsel, and that in one of them, (*Roath* v. *Driscoll,*) this court held to its correctness.

As to the doctrine of *Roath* v. *Driscoll,* I certainly ought to understand what it is, and to be able to comprehend its bearings, for I drew up the opinion in the case with much care and study, and in my judgment no such doctrine is contained in it. The question there, and in the other two cases, was merely as to the title to water that is imperceptible in the earth, a constituent part of it, whether standing or percolating, and it was held to be the true doctrine that, in such a case, the land and the water were the same in the eye of the law, and therefore the man who first sinks a well could not prevent his neighbor from doing the same afterwards, as he

had occasion, although the water in the former well might be lessened thereby; for this is but the reasonable and necessary use of one's own land, of which he may not be deprived. The cases of *Roath* v. *Driscoll* and *Greenleaf* v. *Francis*, relate to wells opened by adjoining proprietors, and the case of *Acton* v. *Blundell* is that of a well and an adjoining excavation for quarrying, by reason of which latter the water was said to pass off imperceptibly, or by percolation, leaving the well dry. The law of underground streams, currents, rivulets and water courses, if they be the same, moving in definite channels under the surface, was not alluded to in the cases; much less was it said that such waters could not be made to work a nuisance by communicating filth and poison to a neighbor's well, from gross and continued neglect.

In the case on trial no discussion was had in the superior court about the title to, or the misuse of streams or watercourses of that character, for the reason that in their declaration the plaintiffs had stated no such cause of injury, but only by water percolating and soaking in the soil; and the evidence we have every reason to believe justified no other claims, and beyond this there has never been any controversy between these parties, so that the discussions which have again and again occupied the attention of this court about streams and under-ground water courses are of no practical importance, leaving the litigants just where they were at the outset.

Again, it is said that we decided in *Roath* v. *Driscoll* that subterranean waters may be *arrested* by sinking a well, and so kept from percolating to a neighbor's well, and that, if this may be done, the owner of the land may do what he pleases,— may accumulate offal on and in it, or fill the water upon it with poisonous substances at will, whatever injury may be done to others through subterranean streams, because he is the absolute and sovereign owner of his own land. This is an inference of law to which I can by no means give my assent, nor is the morality of it of any better character. It is not the doctrine of that case.

That every man is to enjoy his own land according to his pleasure, as a general principle. I admit to be true. He may

dig in it and excavate it for wells, quarries or building purposes, although, by so doing, he interrupts the water that is percolating under the soil, for otherwise he can not beneficially enjoy what is his own.    This is the doctrine of *Roath* v. *Driscoll* and *Acton* v. *Blundell.*    But if we are to understand by streams and water courses more than this, currents and rivulets, it is not settled by those cases that a person may unnecessarily or wantonly stop the water to the prejudice of his neighbor, or suffer it to flow carrying filth and poison into his well.    In *Wood* v. *Waud*, 3 Exch., 748, which was the case of a subterranean water course, the court held that although the defendant was not obliged to suffer the water to pass through his land, and might arrest its flow, he could not *foul* it.    Polluck, J. says, "Though the possessor of the mine may stop the stream, it does not follow that he may pollute it whilst it flows;" and again, "If he pollutes the water so as to make it injurious to the tenant below, the case would be different."    In *Broadbent* v. *Ramsbottom*, 34 Eng. L. & Eq. R., 553, the court held that the owner of land has no right to stop the waters which flow in a natural channel, either subterranean or otherwise, or over the surface, communicating directly with the brook itself.    In *Wheatley* v. *Baugh*, 25 Penn., 534, *Smith* v. *Adams*, 6 Paige, 434, and *Dickinson* v. *Grand Junction Canal Co.*, 9 Eng. L. & Eq. R., 521, it is held that the law of surface streams applies to subterranean streams or water courses which are known, and which move in definite channels.    In the first case, Lewis, Ch. J., in giving the opinion of the court, says, speaking of subterranean water, "We have treated the spring as depending upon percolation alone at the point where the mining operations were carried on, because the evidence does not show that any distant water course leading to it has been cut off.    If this should be shown, and it should also appear that it could have been prevented without material detriment to the owner of the land through which it flowed, the destruction of it might be attributed to malice or negligence;" and again, "The owner of a spring, although his right is imperfect, where the supply is derived through his neighbor's land, has nevertheless a privilege subordinate only to the para-

mount rights of such neighbor, and it is only when the fair enjoyment of these paramount rights requires its destruction that he is bound to submit to the deprivation."

For these reasons I can not concur in advising a new trial.

New trial advised.