Haldeman *et al.* *versus* Bruckhart.

*Springs of water.*—*Injury to by mining adjoining lands discussed.*— *Rights of adjoining owners to subterranean streams.*

1. An owner of land, who, in mining iron ore upon it, drains water from land of an adjoining owner, thereby destroying a spring upon it, is not liable in damages therefor, if there be no evidence of malice or negligence.

2. A landowner may not negligently or maliciously divert even an unknown subterranean stream, to the damage of a lower proprietor; but he may *drain, mine,* or *quarry,* though in so doing he interferes with the flow of water in hidden, unknown, underground channels.

ERROR to the Common Pleas of *Lancaster county.*

This was an action on the case brought September 28th 1861, by Henry Bruckhart against Edwin Haldeman and Paris Haldeman, for diverting or destroying a spring of water on his land.

The material facts of the case were these:—The plaintiff below owns a tract of land of sixteen acres, upon which he and his family reside; on which land, adjacent to his dwelling, there was a large spring of water, which was sufficient to supply all the uses of his family, and was never known to go dry, or be diminished in volume until the fall of 1860. In 1847 defendants bought an adjoining tract of about five acres, for the purpose of mining iron ore, about three hundred and thirty feet distant from the spring. Some ten years since they dug a pit to mine iron ore, and have been mining ever since. They commenced by pumping the water out of the pit with horse-power. In 1858 or 1859 they procured an engine with steam-pump, and in the fall or spring of 1860 two steam-pumps were put up, and when this steam power is in full operation plaintiff's spring is entirely dried up. The spring is affected and diminished in a short time after they commence pumping—but neither the horse-power nor the first steam-pump diminished the spring. It was only when the largely increased power was brought into play that the spring was affected.

The pit is forty feet deep, and about forty yards across; the bottom is an oval fifty by twenty feet; within forty-eight hours after the pumping ceases the spring fills, and the water in the spring is at its natural flow. It requires from six to eight feet of water in the bank before the spring flows.

There are three distinct streams coming into this pit: one from the north-west, four or five inches in diameter. Plaintiff's spring lies south-east from that. The volume of water pumped out of the pit exceeds largely the natural flow of plaintiff's spring. Other springs are similarly affected by the pumps of defendant. A number of coal-pits are dug in that vicinity—eighteen or twenty—none of which, however, affected the water of this spring.

[Haldeman *et al. v.* Bruckhart.]

The defendants requested the court to instruct the jury,

1. That the owner of land through which water flows in a subterranean course has no right or interest in it which will enable him to maintain an action against one who, in carrying on mining operations on his own land, in the usual manner, drains away the water from the land of the first-mentioned owner, and lays his spring dry.

2. The owner of a spring, where the supply is derived through his neighbour's land, has only an imperfect right, a right subordinate to the paramount rights of such neighbour; and when the fair enjoyment of these paramount rights requires its destruction, he is bound to submit to the deprivation.

3. Mining iron ore on their own land by the defendants to supply their furnace is a proper use of their own property, and only a fair enjoyment of their paramount rights; and if thereby the subterranean water supplying the plaintiff's spring is diverted or destroyed, and a loss arises, it is *damnum absque injuria*, and the plaintiff cannot recover.

4. There is no evidence of malice, negligence, or misconduct on the part of the defendants; and the whole evidence in the cause does not prove the existence of such a well-defined subterranean watercourse, in the land of the defendants, as will enable the plaintiff to maintain an action against the defendants for unavoidably diverting or destroying the same, and thereby laying the plaintiff's spring dry, while carrying on their mining operations, and the verdict must be for the defendants.

The court below charged the jury as follows:—" The difficulty in this case, numerous as are the authorities cited, is not in the law, but is in regard to the facts, or rather the fact, as to the character of the supply of water to the plaintiff's spring, for the alleged injury to which he has brought this action. Was this spring supplied by a general percolation or oozing of the water through the soil beyond and above it, or by a subterranean or under-surface stream of water running down through the defendants' premises and issuing from the surface of this spring? The law is clear with respect to all streams or watercourses above the surface, or running over one tract down and through others, that each owner of the lands through which it passes may use it or so much of it as he may require, but he must not divert it from its natural course so as to deprive his neighbour below of his interest in it. If he does, he is liable for the injury. Where the stream is under ground, instead of above it, the same rule will hold, if it be a well-defined subterranean or under-surface stream or watercourse of which a party complains of being deprived. If a valuable spring is supplied by such a stream, and is ruined by diverting it, the injury is just as great as if the stream had run upon the surface. The only difference is in ascertaining the fact

whether in the former case it is a clearly well-defined stream which contributes the supply or not; whereas, in the case of a surface-stream the matter is susceptible of ocular proof. It is often impossible to say whether a spring is furnished by percolation or by a running stream, a current under ground, and therefore the law, according to the authorities, holds that when the owner of a spring complains of being injured by his neighbour above him, in consequence of sinking a well, or shaft, or pit on his premises, thereby depriving the spring of its water, he can have no redress unless he can show that his neighbour has thereby interrupted or diverted a well-defined watercourse, which had before passed through those premises to the spring in question. Without showing this, it will be considered that the supply had been furnished by the general contribution of the soil, and a suit could not be maintained for the alleged injury. So that the law protects the owner in the full enjoyment of his land in such manner as he thinks proper, against all complaints of those who complain of having their springs of water destroyed by reason of his mining or other operations, except when the latter can prove that a stream of water beneath the surface which issued in the spring had been cut off by the former, and turned out of its course, proving that the claim to compensation is established.

"You will see from this statement of the law that the question in this case is, whether the spring of Henry Bruckhart was supplied by a running stream under ground, a well-defined watercourse, or by percolation, by the water filtering or oozing through the soil, and forming the spring at that point, and this fact you are to ascertain from all the evidence you have heard. If you believe the supply was by a subterranean stream passing through the defendants' land, and that by the pit which they excavated, as the evidence shows, this stream was interrupted, and by their pumping out of the water and changing of its course the plaintiff's spring was made dry, then he is entitled to redress, and your verdict should be in his favour; but if you do not believe that there is a well-defined subterranean watercourse passing through the defendants' land, and issuing in this spring, which they have interrupted by their pumping operations, you will find for the defendants."

The points propounded as above were answered as follows:—

"1. I answer this point in the affirmative, and say that this is true, unless it is proved that there is a well-defined watercourse, which supplies the spring, and that the party carrying on the mining operations has interrupted or diverted that watercourse, and thus occasioned the injury to the spring."

"2. The law is so, where it cannot be ascertained and shown that the supply is by a well-defined watercourse, though under

ground, the entire diversion thereof to the destruction of the spring, would entitle the owner of the spring to redress."

" 3. The first part of this proposition is correct; but the conclusion can only be sustained, provided the plaintiff has failed to show that the subterranean water supplying his spring flowed in a well-defined channel or stream from and through the defendants' premises to his spring, and issued there."

" 4. This is conceded as to the conduct of the defendants; as to the rest of the proposition, the objection is, that it requires of the court to pronounce what it is the province of the jury to find. It is for you to say whether the whole evidence proves the existence of a well-defined watercourse in the land of the defendants, which had furnished the water to the spring in question, and the interruption·of such watercourse by the defendants, so as to dry up the plaintiff's spring or not. According to your finding upon that issue your verdict will be for the plaintiff or for the defendants."

" If you find for the plaintiff, it will be necessary for you to say what damages he has sustained. The proper measure of damages is the inconvenience to which he has been subjected by being deprived of the use of his spring. This you will estimate by the testimony and your own judgment of the injury, according to the facts in evidence."

Under these instructions there was a verdict and judgment in favour of the plaintiff. Whereupon the defendants sued out this writ, averring that the court below erred in not affirming unqualifiedly the four points presented by them on the trial.

*H. M. North,* for plaintiffs in error, cited and relied on Haverstick *v.* Sipe, 9 Casey 368; 16 Leg. Int. 301; Panton *v.* Holland, 17 Johns. 92; 12 Mass. Rep. 220; 8 Johns. 421; Acton *v.* Blundell, 12 Meeson & Welsby 324; Wheatley *v.* Baugh, 1 Casey 528; Am. Railway Ca. 553; Chatfield *v.* Wilson, 8 Am. L. Reg. 528; Ellis *v.* Duncan, 21 Barb. 230.

*William B. Fordney,* for defendant in error, relied on Wheatley *v.* Baugh, 1 Casey 528; Tyler *v.* Wilkinson, 4 Mason's U. S. Rep. 397; Hetrick *v.* Deachler, 6 Barr 32; Miller *v.* Miller, 9 Id. 74.

The opinion of the court was delivered, July 1st 1863, by
Strong, J.—Confessedly the absolute dominion of a proprietor over his land to the centre of the earth, is restrained by the maxim " *sic utere tuo ut alienum non lædas.*" But what is an injury ? The rightful use of one's land may cause damage to another without any legal wrong. An act done, causing damage which the law will redress, must not only be hurtful, but wrong-

ful. There must be *damnum et injuria,* an act not merely hurtful, but an infringement of another's right. The plaintiff in this case cannot therefore recover, unless the acts of which he complains were in violation of some rights which he had upon the lands of the defendants. That an inferior proprietor has a right to the uninterrupted flow of the water in a surface watercourse leading to his land over the land of an adjoining proprietor, is a familiar principle; but he has no such right to an unknown subterranean stream which feeds his spring, or flows out upon his land. For any flowage in such a stream, he has, in ordinary cases, no servitude upon the land of his neighbour, at least he has no natural right to enforce such a servitude. After the full discussion which this subject received in Wheatly *v.* Baugh, 1 Casey 528, little remains for us now to add. In that case it was ruled, that where a spring depends for its supply upon filtrations or percolations of water through the land of an owner above, and in the use of the land for mining or other lawful purposes the spring is destroyed, such owner is not liable for the damages thus caused to the proprietors of the spring, unless the injury was occasioned by malice or negligence. To such percolations or filtrations, then, the inferior owner has no right. This was all that was necessary to the decision of the case.

In the opinion delivered by this court, it was said, indeed, that inferior proprietors may have rights in subterranean streams, and those were instanced that in limestone regions often pursue their course in great volume and power, and then emerging from their caverns, furnish power for machinery, or supply towns and settlements with water for all the purposes of life. To say that such streams might be obstructed or diverted, merely because they run through subterranean channels, would be, said the court, to forget the rights and duties of man in relation to flowing water. Underground currents of such a description are exceptional in their nature, and the same reason exists for holding that a lower proprietor has a right to insist upon their uninterrupted flow, as exists in the case of watercourses on the surface. Their existence and their course are generally known. If, therefore, the owner below has any rights in them, they are perceptible, and the owner of the land through which they pass may, in most cases, have the fullest use of his property without disturbing them. What was said upon these exceptional cases had been previously, though more guardedly, said in Dickinson *v.* The Grand Junction Canal Company, 9 Eng. Law & Eq. 521, a case decided in the English Court of Exchequer, where a distinction between water running on the surface and sub-surface streams was asserted, but the court said "if the course of a subterranean stream were well known, as is the case with many which sink under ground, pursue for a short space a subterraneous course,

and then emerge again, it never could be contended that the owner of the soil under which the stream flowed could not maintain an action for the diversion of it, if it took place under such circumstances as would have enabled him to recover if the stream had been wholly above ground."

Throwing out of view for the present such exceptional cases, there is a well-marked distinction between the flowage of water in surface and sub-surface channels.

A proprietor of land may, in the proper use of his land for mining, quarrying, building, draining, or any other useful purpose, cut off or divert subterraneous water flowing through it to the land of his neighbour, without any responsibility to that neighbour. Some of the grounds for the distinction are clearly pointed out in Acton *v.* Blundell, 12 M. & W. 324, and others may be mentioned. They are that in case of an underground supply to a spring or well, or a stream emerging upon land of a lower proprietor, the water does not flow openly in the sight of the owner of the soil under which it passes, that there is therefore no reason for implying consent or agreement between the proprietors of the adjoining lands beneath which underground currents exist, which is one of the foundations upon which the law as to surface streams is supposed to be built; and that for the same reason no trace of positive law can be inferred. Again, if the lower proprietor has a right to the undisturbed flowage of water through subterranean passages in his neighbour's land, he has the power of preventing that neighbour from using the water in his own soil, for he cannot use it and return it to its old passage-way, which he may do in the case of a surface stream. Such a right, if it exists, also exposes the upper proprietor to the hazard of incurring fruitlessly heavy expenditures in efforts to improve or use his land, since he can have no knowledge until after his outlay has been made, that his contemplated use will interfere with any rights or interests of an adjoining owner. A surface stream cannot be diverted without knowledge that the diversion will affect a lower proprietor. Not so with an unknown subterraneous percolation or stream. One can hardly have rights upon another's land which are imperceptible, of which neither himself or that other can have any knowledge. No such right can be supposed to have been taken into consideration, when either the upper or lower tract was purchased. The purchaser of lands on which there are unknown sub-surface currents, must buy in ignorance of any obstacle to the full enjoyment of his purchase indefinitely downwards, and the purchaser of lands on which a spring rises, ignorant whence and how the water comes, cannot bargain for any right to a secret flow of water in another's land. It would seem, therefore, most unreasonable, that the latter should have a right to prevent his neigh-

[Haldeman *et al.* v. Bruckhardt.]

bour from enjoying his own land in the ordinary way, either by digging wells, cellars, drains, or by quarrying and mining. A further reason for holding that there is no such right, is found in the indefinite nature and great extent of the obligation which would be imposed if the right existed. Instances have occurred where excavations have had the effect of draining land, although at the distance of several miles: Gale & Wheatley on Easements 178. Even in the case before us, the mining pit of the defendants is more than three hundred feet distant from the plaintiffs' spring. These appear, to us very sufficient reasons for distinguishing between surface and subterraneous streams, and denying to inferior proprietors any right to control the flow of water in unknown subterranean channels upon an adjoiner's land. They are as applicable to unknown sub-surface streams as they are to filtrations and percolations through small interstices. Neither can be defined watercourses, though they may be definable.

The distinction thus founded in reason, is recognised by the law. The civil law adopted it. Thus in Dig. vol. 39, 3, "de aq. et aq. pl. arc. Denique Marcellus scribit, cum eo, qui in suo fodius vicini fontem, avertit nital posse aqui, nec de do to actio rem; et sane non debet habere, si non animo vicini nocendi sed suum agrum meliorem faciendi id fecit." The common law is the same.

The leading case of Acton *v.* Blundell, 12 M. & W. 324, already referred to, asserts it distinctly; and the distinction between surface and underground waters which was there drawn, was recognised in Dickinson *v.* The Grand Junction Canal Co., 9 Eng. Law & Eq. 520, as well as in our own case of Wheatly *v.* Baugh. So in Ellis *v.* Duncan, 21 Barb. 230, it was ruled that the owner of a farm may dig a ditch to drain his land, or open and work a quarry upon it, although by so doing he interrupts one of the underground sources of a spring on his neighbour's land; and it was said, "the rule that a man has the right to the free and absolute use of his property, so long as he does not directly invade that of his neighbour, or consequentially injure *his perceptible and clearly defined rights*, is applicable to the interruptions of the sub-surface supplies of a stream by the owner of the soil, and the damage resulting from it is not the subject of legal redress."

The same thing was decided in Roath *v.* Driscoll, 20 Conn. 533, 542; and in Brown *v.* Illins, 27 Conn. 84, it was more emphatically ruled, and the court adopted the mode of expression used by one of the counsel in Acton *v.* Blundell, saying in regard to subterranean streams and currents, "there is not any *jus alienum* on the part of the owner of the other lands, and therefore the maxim '*sic utere tuo ut alienum non lœdas*' does not

[Haldeman *et al. v.* Bruckhardt.]

apply." Nor are there any well-considered decisions which are inconsistent with these. Whetstone *v.* Bowser, 5 Casey 59, was a case where the stream diverted was partly on the surface and partly underground. It was a well-known stream, and the diversion complained of was on the surface. In Smith *v.* Adams, 6 Paige 433, the stream which supplied the spring was known, and the water was taken from a place just above the point where it had emerged, not for the enjoyment of the land where it had flowed, but for the use of another tract at some distance from it.

We think, therefore, that the learned judge of the Common Pleas misapprehended what had been ruled in Wheatly *v.* Baugh. The defined watercourses there spoken of which a man may not divert to the hurt of an inferior proprietor, are not the hidden streams of which the owner of the soil through which they pass can have no knowledge until they have been discovered by excavations made in the exercise of his rights of property.

There are known streams to which, if the lower proprietor has any rights, they are perceptible, and require no sub-surface exploration before their course can be defined.

We are not, however, to be understood as intimating that an owner may maliciously or negligently divert even an unknown subterranean stream to the damage of a lower proprietor. But in the enjoyment of his land he may cut drains, or mine, or quarry, though in so doing he interfere with the flowage of water in hidden, unknown, underground channels.

Applying these principles to the present case, we are constrained to say we see no evidence of malice or negligence on the part of the defendants. Mining on their land as they did, was no more than the exercise of their legal rights. If in so doing, they interrupted an underground stream which supplied the plaintiff's spring, it was *damnum absque injuria,* and there was no evidence of the existence of such a known well-defined watercourse under ground in the land of the defendants, as will enable the plaintiff to maintain an action against them for diverting it by their mining operations, and thus destroying the spring. The points proposed by the defendants should have been unqualifiedly affirmed.

The judgment is reversed, and a *venire de novo* awarded.