NANNIE R. COLLINS v. CHARTIERS V. GAS CO.

MARY L. OSBON v. CHARTIERS V. GAS CO.

APPEALS BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS
NO. 2 OF ALLEGHENY COUNTY.

Argued November 4, 1889—Decided January 6, 1890.

[To be reported.]

1. The rule definitively settled in Penna. Coal Co v. Sanderson, 113 Pa.
126, that for unavoidable damage to another's land, in the lawful use of
one's own, no action can be maintained, does not exempt a landowner
from all obligation to pay regard to the effect of his operations on sub-
terranean waters.

2. The distinction between rights in surface and in subterranean waters is
not founded on the fact of their location above or below ground, but on
the fact of knowledge, actual, or reasonably acquirable, of their exist-
ence, location and course; in either case, the rule of damnum absque
injuria applies only in the absence of negligence: Wheatley v. Baugh,
25 Pa. 528; Haldeman v. Bruckhart, 45 Pa. 514; Lybe's App., 106 Pa.
634.

3. If a person boring for oil or gas have knowledge that neighboring
water wells are supplied from a stratum of clear water underlying his
land, and that there is a deeper stratum of salt water likely to rise and
mingle with the fresh, when penetrated in such boring, and may pre-
vent this mingling by a reasonable outlay, his failure to use the means
available therefor is negligence.

4. Whether, for an injury to the water well of a neighbor from such com-
mingling, plainly to be anticipated and reasonably preventable, the
owner of a gas well, who committed the drilling of it to an independent
contractor, without requiring the use of any means to guard against
such injury, is liable, notwithstanding the letting of the drilling out
upon such contract, not decided.*

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILL-
IAMS, McCOLLUM and MITCHELL, JJ.

Nos. 177, 204 October Term 1889, Sup. Ct.; court below,
Nos. 157, 509 April Term 1888, C. P. No. 2.

To No. 157 April Term 1888, of the court below, Nannie R.
Collins brought trespass against the Chartiers Valley Gas Com-

---

* See Berberich v. Ebach, post, 165.

pany to recover damages for an injury to a water well owned by the plaintiff, alleged to have been occasioned by the negligence of the defendant. To No. 509 of the same term Mary L. Osbon brought a similar action against the same defendant to recover for a like injury.

The two cases having been put at issue, they were tried together on May 6, 1889, when the following facts were shown:

Each of the plaintiffs is the owner of a small lot of ground, with a house thereon, situate in the borough of Glenfield in Allegheny county. On each of said lots is a well used to supply water for domestic uses on the premises. On June 7, 1887, the defendant, being engaged in the business of producing and supplying natural gas, entered into a written contract with C. J. Hummel, by which Hummel engaged to drill a well for natural gas upon a " location " in the borough of Glenfield, distant about 100 feet from the water well of one of the plaintiffs, and about 125 feet from that of the other. The contract provided that Hummel should encase said gas well with eight and one fourth inch casing to the depth of 700 feet, and deep enough to shut off all fresh water, and below that with six inch casing to shut off any water or caving rock found just above the gas rock, and should warrant the well absolutely free from water and do all work to the satisfaction of the defendant's superintendent; all tools, and gas and water connections, to be furnished by Hummel, and all casing required for the well to be furnished by the defendant. The contract contained also the following clause: " All springs to be fully protected from damage, and drillings to be carried from the wells to such point as will do least damage to property possible."

The well thus contracted for was begun sometime in June and finished in August or September 1887. At the depth of about 70 feet it passed through the vein of fresh water which supplied the plaintiffs' wells, and at about 700 feet below the surface it passed through a large quantity of salt water, which, rising and mingling with the fresh water, ruined the plaintiffs' wells, and rendered the water therein utterly unfit for domestic uses. There was evidence tending to establish that the defendant ought to have anticipated that its well would encounter this salt water and that it would thus affect neighboring water wells, unless precautions were taken to prevent the two kinds

of water from commingling; that by the use of well known appliances this commingling could have been prevented, and this had often been done, though it was not customary and had been done only in cases where the operator desired to guard against injuring water wells on his own property; and witnesses estimated the cost of one method of effecting this object at about $50, and the cost of another method at from $200 to $250. After the completion of the gas well, the defendant took it off the contractor's hands and remained in possession of it down until the time of the trial. Agents of the defendant were notified of the injurious effect of the salt water upon the plaintiffs' wells, and promised to remedy the injury, but did not do so.

At the close of the testimony, the court, EWING, P. J., charged the jury:

Counsel on each side have presented to us numerous points of law to be answered, which we will not undertake to answer in detail. The view we take of the main point in the case is such that it is unnecessary.

The plaintiffs are each the owner of a small lot of ground, with a house thereon, in the borough of Glenfield, situated down the Ohio river, on the Ft. Wayne railroad, about seven miles below the city. The defendant company undertook to and did drill wells for natural gas on property in the borough, and in the immediate vicinity of these lots. There were several wells, as I understand, but the well in question was begun about the middle of June, 1887, was finished, perhaps, in the latter part of August of that year, and was put down in all a distance of about 1,600 feet. From the description of the witnesses, the village of Glenfield is on the river and railroad, and its territory runs up on the hill for some distance. There is a high hill fronting the river, and Killbuck run puts into the river at this point, running up one side of the property, or through the borough, rather, and a very high steep hillside comes down from the top for a considerable distance. The larger portion of the houses in the thickly built up portion of the town, is on comparatively level land lying between the foot of this river hill and the river. The soil or surface of the land there, is composed of gravel and coarse sand, with, of course,

better soil on top, but it is the accumulation of gravel from ages past, no doubt partly from the river and partly from this Killbuck run, and through this sand and gravel water permeates easily. That gravel is on a bed of slaty rock, varying from 2 to 20 feet below the surface. Digging down through the surface soil and into this gravel, they go down some distance to the slaty rock which would appear to hold the water, and they get water in large quantities at any place that they may dig. The gravel is no doubt permeated with water, and wells are obtained for the use of the houses built there; and the plaintiffs each had her well of what has been testified to as good, clear, cold water, and it is claimed that it was very pure. The well of the defendant company was started 125 to 150 feet, or 100 to 150 feet away from one or the other of these places, on the hillside at an elevation of about 75 feet above this gravel bed below. The defendants drilled down through the rock and soil there, and at the distance of what Mr. Hummel, the driller of the well, says was about 90 feet below the surface, some of the drillers saying about 70 feet, but apparently about the level at which the water stands in this gravel below, there, in a coarse sand rock they struck fresh water of the kind ordinarily expected. That fresh water no doubt has flowed on down through that sandy rock into this gravel below, and the jury might fairly find that that was the source, the principal supply of water into the gravel bed of the bottom land below on which the houses are built. The drillers of the gas well drilled on down through this rock, and down in another rock below, a distance of about 140 feet, say 50 or 60 feet below where this gravel bed is, on lower land, they got another supply of fine, fresh water. Of course that did not disturb, and did not affect the flow of water in the wells in the gravel bed below, but they went on down about 720 feet, when they struck, not far apart in two places, salt water that rose up to meet its level in some distant basin, rose up and mixed with the fresh water. It seems to have been very salty, and in a few days thereafter it began to tell on the water in the wells of the plaintiffs, and it rapidly got worse, until in a short time it seems they were unable to use the water for drinking, cooking, washing, for watering plants or for any other purpose, utterly destroying it, and it has continued so since and the plaintiffs

seek to recover damages for this injury to their wells respectively.

Now it is claimed by the defendant that because they had a contract with Mr. Hummel to drill this well for a certain price, an independent contract, that they are not responsible. We do not so interpret the contract. On the other hand, taking all the testimony, if believed, the contract was to do that which paid no attention to the probability of injuring these wells; and in fact, if I understand the contract, it rather excludes from it, unless it would be otherwise ordered by the defendant company, the idea of protecting against this flow of salt water into the water below. The testimony offered by the defendant, again, shows that the ordinary way of drilling is to case or shut off the salt water from the well, for the benefit merely of the well owner, the well which is being drilled. It seems that it is not an uncommon thing, and Mr. Hummel testified that he has frequently done it, to shut off the salt water from the fresh water, so as to protect the wells or water on the tract where the well is being drilled. But the custom appears to be to pay no attention to the rights or injuries of people owning property anywhere in the neighborhood. It does not strike me that that custom has much to do with the question of right in this case; the fact that people neglect their duty would not affect the liability of the defendant here.

There is evidence from which the jury might fairly find that the destruction of the well of the plaintiffs was brought about by the salt water coming up and mixing with the fresh water; I have to assume that they would so find. I think there is evidence from which the jury fairly could find, that the defendant company when the well was drilled knew, or ought to have known, if they had exercised any reasonable judgment, or investigated, or paid attention to it, that the boring of this well in the way it was done, without shutting off the salt water from the fresh water, would almost inevitably ruin these and other wells in the immediate vicinity. And I think there is evidence from which the jury could fairly find, and probably would find, that the defendant could, with the outlay of a small amount of money, 50 to 250 dollars, have shut off the salt water from the fresh water so that it could not have done any injury; [but as I understand the decisions in our own

state and in some others, the courts lay down a rule that governs here, that although it may be a hardship in this case, yet the general rule is that where a party, as the defendant company, drills, mines, works on his own property, in the way this was done, he is not bound to pay any attention to what the effect may be on hidden streams beneath, what the effect may be on his neighbor; he has a right to use his own property in boring in this way, or mining or drilling, and unless he is actuated by malice, he would not be liable for the consequences.] [3]  If this were an open stream, I think they would be clearly liable; if this were a stream of water open on the surface, and they could with reasonable outlay and care have .prevented the poisoning of the stream, I think they would be liable, but there is no such stream; [there is nothing but the percolation of water through the rock where the defendant company bored down; and we feel constrained under the decisions that have been shown us, and as we understand the law, to say to you that the plaintiff cannot recover in this action, and that your verdict, from the evidence, should be for the defendant;] [4] and I state this at length in the way of explanation to the jury, in order that when this case goes to the Supreme Court, they may be able to see the ground on which I have so instructed you.

The jury accordingly returned verdicts in favor of the defendant.   Rules for a new trial having been granted, the court, EWING, P. J., filed the following opinion:

These cases were tried together, and the facts are substantially the same in each.   The vital question in the cases is a close one; it is a very interesting question and has become a very important one, the developments and experience of the last twenty-five years having produced a state of facts different from that on which similar questions have heretofore been ruled.

In the oral charge to the jury, the stenographer's report of which is on file, the court stated the evidence, assuming that the jury would find the facts in favor of the plaintiffs, were the questions submitted to them.   There is but little doubt that the jury would have found that the pollution of the wells of the plaintiffs respectively, was caused by the defendant drilling its gas well on its own property, close to the wells of the

plaintiffs, about 100 and 125 feet away; that the pollution of the water came from permitting the salt water that rose from a depth of about 700 feet, to mix with the veins of fresh, near the surface, about 70 feet, which supplied plaintiffs' wells; that at the time of contracting for the drilling of this well, the defendant knew, or should have known, that the plaintiffs' wells would almost necessarily be ruined by the drilling of its well, unless precautions should be taken to shut off the salt water from the fresh water; and that by well known means, in general use, where the driller of an oil- or gas-well desires to preserve the fresh water on his own property, this salt water could certainly have been shut off from contaminating the fresh water, and this at the moderate expense of $50 to $75, by one method, and about $250 by the permanent method of double casing below the fresh water, and without detriment to the gas well. The evidence would have justified these findings. On this state of facts, following what we understand to be a strong line of decided cases, the court instructed the jury to find for the defendant.

The facts raise a conflict between the two maxims, "sic utere tuo ut alienum non lædas," and "cujus est solum ejus est usque ad cœlum et ad inferos." If the former maxim is to prevail, the right is with the plaintiffs; if the latter, it is with the defendant. If this were the case of a running stream in a well known channel on the surface, the defendant would be liable, because its pollution of the visible stream would not be necessary to the enjoyment of its own property, as it is easily preventable, and it would be bound to take the necessary precautions to prevent the pollution. But a different rule prevails in regard to underground hidden veins of water, or percolations through the rock or soil. The general rule as to such water is, that the owner of the land may use his land for any lawful purpose; and in agriculture, or by mining, or in any other lawful way, take for his own use, or divert the underground water without liability to his neighbor therefor.

In Acton v. Blundell, 12 M. & W. 324, decided in 1843, a leading case, the distinction is drawn between a surface stream of water, and an underground vein or percolation that may be cut off by a well dug, or a mine opened on land of an adjoining owner, the one being known and the other unknown and un-

certain. It is there declared that "the owner of the soil owns all that lies beneath the surface;" that the land immediately below is his property whether it be solid rock, or porous ground, or venous earth, or part soil and part water; he may dig therein and apply all that is therein found to his own purposes at his free will and pleasure; and that if in the exercise of such right he intercepts or draws off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of damnum absque injuria. The reason given is, that the course of underground streams of water is so uncertain that until the well is sunk no one can tell whether or not there will be any effect on the flow of water. In Chessmoro v. Richards, 5 H. & N. 982, decided in 1859, Acton v. Blundell was followed, though Lord WENS-LEYDALE, in a concurring opinion, lays down a rule that if the work done by the owner of the land, though otherwise lawful, were done for the purpose of injuring another, the law would forbid it.

The rule in Acton v. Blundell has been generally followed in this country, without any qualifications. The leading case in Pennsylvania is Wheatley v. Baugh, 25 Pa. 528; opinion by Judge LEWIS, than which there is no abler discussion of the question in either English or American authorities. Acton v. Blundell is followed.

In Wheatley v. Baugh, a spring which supplied plaintiff's tannery was dried up by pumping the water out of the copper mines of defendant, which pumping of water was necessary to the working of the mine. Judge LEWIS says: "In conducting extensive mining operations, it is in general impossible to preserve the flow of subterranean waters through the interstices in which they have usually passed, and many springs must be necessarily destroyed in order that the proprietors of valuable minerals may enjoy their own. The public interest is greatly promoted by protecting this right, and it is just that the imperfect rights and lesser advantage should give place to that which is perfect, and infinitely the most beneficial to individuals and the community generally." The learned judge further says: "We have treated the spring as depending upon percolations alone at the point where the mining operations were carried on, because the evidence does not show that any dis-

tinct water-course leading to it has been cut off or diverted. If this should be shown, and it should also appear that it could have been preserved without material detriment to the owner of the land through which it flowed, the .destruction of **it** might be attributed to malice or negligence. The beneficent Being who created the earth and gave man dominion over it imposed on him the duty of doing to others as he would that they should do to him. Upon this high moral obligation rests the legal one which requires every one so to use his own privileges as not to injure the rights of others. In all the relations of social life, it is to the interest and duty of each to respect the privileges of others. The law which requires this, acts with a reasonable reference to the public convenience and general good, and it is not betrayed into narrow strictness subversive of common sense, nor into extravagant looseness, which would destroy private rights. In determining what is reasonable, the circumstances of each case must be considered, and the jury under the instructions of the court must in general decide the question." This last quotation, from the opinion of Judge LEWIS, is a strong presentation of the plaintiffs' position in the present case. It is, however, but an obiter dictum.

Haldeman v. Bruckhart, 45 Pa. 515, is similar to Wheatley v. Baugh, and was decided in the same way. Judge STRONG, however, in delivering the opinion of the court, makes the same reservation as was made in Wheatley v. Baugh, as to the defendant. being liable in case he acted maliciously or negligently.

We do not consider the case of Penna. Coal Co. v. Sanderson, 113 Pa. 126, cited by defendant's counsel, as governing this case. In that case, had it appeared that the coal company, by a reasonable expenditure in their operations, could have fully enjoyed their property without fouling the stream that flowed down over Sanderson's property, the decision of the case would have been different. That case marked a distinct progress in the law of this state. Undoubtedly, the general rule of law, before and since is, that the owner of land through which a well defined stream of water flows, cannot foul the stream to the detriment of a lower proprietor without being liable; and this because the owner of the land can usually

enjoy and use his own property for all reasonable purposes, without damaging his neighbor. But in the Sanderson case, the property of the coal company could not be used without fouling the water; the great public interests and the private rights of mining could not be sacrificed to preserve the inferior right and interest of the lower proprietor. The reason for the general rule failed, and the rule was not followed.

In McLord's Executors v. The Carbon Iron Mfg. Co., 38 N. J. Eq. 452, it is held that, "for water that gets into complainant's mine, from the defendant's mine, by gravitation or percolation, or by any other natural means, it is clear that the defendant is not in any way responsible." In Brown v. Hius, 25 Conn. 583, it is held that in such case, if the defendant's acts are done in prosecuting a lawful business on his own land, his motives are immaterial. In Frazier v. Brown, 12 Ohio 294, the questions are fully discussed and the conclusion is thus stated: "The law recognizes no correlative rights in respect to underground waters, percolating, oozing, or filtrating through the earth, and this mainly on the grounds of public policy: 1. Because the existence, origin, movement, and course of such waters, and the causes which govern and direct their movements are so secret, occult and concealed, that an attempt to administer any set of legal rules in respect to them, would be involved in hopeless uncertainty, and therefore would be practically impossible; 2. Because any such recognition of correlative rights would interfere to the material detriment of the public, with drainage and agriculture, mining, the construction of highways and railroads, with sanitary regulations, building, and general progress of improvement in works of embellishment and utility." This is a fair summing up of the conclusion of law reached in the English and American cases, with the reasons given for the conclusion, when any reason is given.

Some authorities draw a distinction between the abstraction of water in such situations, and the pollution thereof. In Hodkinson v. Ennor, 4 B. & S. 229, MELLOR, J., says: "There is a great distinction between abstracting water before it becomes the property of plaintiff, and sending polluted water into water to which he is entitled;" but this was where the defendant had, by washings of lead-producing earth on his own land, allowed the poisoned water to percolate through the rocks

to a flowing stream. We can see good ground for the distinction, but the weight of authority seems to be against it, especially when the pollution comes from a lawful operation of mining, whereby water naturally rises in the new channel that may be opened.

While in our opinion the equities are with the plaintiffs, the adjudicated law is decidedly against them. There is, however, a view of the case arising from the new circumstances, which the plaintiffs are entitled to have considered. The drilling of deep wells for producing petroleum and natural gas has become a very important branch of industry in Pennsylvania. The districts in which these products are found, and especially that of the Pittsburgh coal field, are of wonderfully uniform geological formation. Experience has shown that fresh water supplying springs and wells is almost certainly found comparatively near the surface, while almost as certainly salt water is found at greater depth, and usually when struck, if uncontrolled will rise and mix with the fresh water, polluting the supply of fresh water for considerable distances around. Since the decisions in Acton v. Blundell, and Wheatley v. Baugh, probably more deep wells have been drilled in Western Pennsylvania, than had been previously dug in the entire earth in all time. And that which was then held to be necessarily unknown and merely speculative as to the flow of water underground, has been by experience in such cases as this reduced almost to a certainty. Until recently most of this drilling of wells was in sparsely settled districts; latterly, much of it is close to or within the limits of towns. Following the precedent of the Penna. Coal Co. v. Sanderson, the Supreme Court, when the reason for the old rule applicable to such cases as these has disappeared, may disregard the precedents. We feel bound to follow the adjudicated cases.

Counsel for defendant contends that the Chartiers Natural Gas Co. having given out the contract for boring this well to C. J. Hummel, they are not responsible. We are of the opinion that this point is not well taken. 1. It is not the kind of case or damage against which an owner can protect himself by giving out a contract. 2. An inspection of the whole contract shows that it was not intended to include any protection against damages suffered by other parties than the owner of the land

on which the well was drilled. It excludes it, unless specially ordered. Although it does provide for casing off all the salt water for the benefit of the well drilled, it makes no provision for separating the salt water from the fresh. 3. The defendant took possession of and maintains the well, keeping up the damages to plaintiffs' wells, to the present time, after full notice of its effects, and with ability to remedy it.

New trials will be refused.

Judgments having been entered on the verdicts, the plaintiffs thereupon took these appeals, assigning for error :

3, 4. The parts of the charge embraced in [  ] [3] [4]

*Mr. James S. Young* (with him *Mr. S. U. Trent*), for the appellants :

1. He who negligently or maliciously diverts or corrupts a subterranean stream, whether it is distinctly defined or subsists in the nature of percolation, so as to deprive his neighbor of it, is liable in damages : Chessmoro v. Richards, 5 H. & N. 890 (7 H. L. 349), opinion of Lord WENSLEYDALE; Angell on Watercourses, § 114 *m*; Wheatley v. Baugh, 25 Pa. 528; Haldeman v. Bruckhart, 45 Pa. 514; Lybe's App., 106 Pa. 526; Penna. Coal Co. v. Sanderson, 113 Pa. 126. The distinction drawn in most of the authorities between well defined streams and mere percolations must fall, where there is malice or negligence, because these presuppose knowledge. Unlike the English and most of the American cases, our Pennsylvania authorities give full force to both the maxim, cujus est cœlum, etc., and the maxim, sic utere tuo, etc., by the use of the words malice and negligence, and are therefore more sound and logical.

2. There is a distinction between the diversion of streams and the corrupting of them, whether surface or subterranean, whether known and defined, or unknown, and subsisting as percolations ; and greater care must be exercised to prevent the corruption of waters than the diverting of them : Hodkinson v. Ennor, 4 B. & S. 229; Frazier v. Brown, 12 Ohio 294, 312; Tenant v. Goldwin, 2 Ld. Raym. 1089. Nor is the case of Penna. Coal Co. v. Sanderson, 113 Pa. 126, an exception to this rule, for in that case the water was allowed to run out

through the natural water-course, while in our case it was allowed to mix with the subterranean streams. The failure of the defendant to prevent the injury to the plaintiff's wells which it knew would occur, knew how to prevent and could have prevented at a small expense, amounted to such gross negligence as to be in effect malicious. We adopt as a part of our argument the latter portion of Judge Ewing's opinion.

*Mr. James C. Doty* (with him *Mr. John M. Kennedy*), for the appellee:

1. No malicious cutting off or polluting of the water-courses or percolations is shown. Nor is it shown that the work was done negligently, or otherwise than in the almost universal way. An owner is not liable for diverting or destroying the use of an underground spring or current of water which has no defined course, while making use of his own land for a lawful purpose, without an intention to injure his neighbor: Washburn on Easements, § 364 et seq.; Angell on Watercourses, § 114 *a*, et seq.; Penna. Coal Co. v. Sanderson, 113 Pa. 126 ; Haldeman v. Bruckhart, 45 Pa. 514 ; Wheatley v. Baugh, 25 Pa. 528 ; Brown v. Illius, 27 Conn. 84 (71 Am. Dec. 49) ; Frazier v. Brown, 12 Ohio 294; Johnson Cheese Mfg. Co. v. Veghte, 69 N. Y. 16 ; Acton v. Blundell, 12 M. & W. 324 ; Chessmore v. Richards, 7 H. L. 349; West Cumberland Iron Co. v. Kenyon, L. R. 11 Ch. Div. 773. Lord WENSLEY-DALE's opinion in Chessmore v. Richards, is in the nature of a dissent.

2. The distinction contended for between liability for diverting and for corrupting streams, can arise only when the character of the water is changed by artificial means, and not when the impurities arise from natural causes. The wells of the plaintiffs were not corrupted, in the proper sense of the term. Nor is it shown that the defendant knew of the existence of underground streams or percolations, or that the · injury complained of could be prevented by means well known to the defendant. The testimony shows that the well was put down in the usual way. We cannot agree with the learned judge that the reason of the old rule applicable to such cases as these has disappeared. On the contrary, it becomes more necessary as the great manufacturing, mining, oil and gas operations in this state are increasing in extent yearly.

Opinion of the Court.

3. Conceding, for the argument, that the plaintiffs would have a cause of action if the injury complained of were caused by negligence in the work of drilling, and that such negligence is shown, the defendant is not responsible, because any such negligence was not its own, but the negligence of an independent contractor, representing the will of his employer only as to the result of his work, and not as to the means by which it was to be accomplished: Chartiers V. Gas Co. v. Lynch, 118 Pa. 362; Edmundson v. Railroad Co., 111 Pa. 316; Erie v. Caulkins, 85 Pa. 247; Harrison v. Collins, 86 Pa. 153; Wary v. Evans, 80 Pa. 102. Moreover, the contractor was required to protect from damage all springs, a term which is synonymous with and necessarily includes wells, and it was his plain duty to furnish protection to the springs supplying these wells if any were required.

OPINION, MR. JUSTICE MITCHELL:

The dividing line between the right to use one's own, and the duty not to injure another's, is one of great nicety and importance, and frequently of difficulty. The Pennsylvania decisions have endeavored with unusual care, to preserve the substance of both rights, as far as their sometimes inevitable conflict may permit.

With regard to the use and control of flowing water, and of water-courses, the case of Penna. Coal Co. v. Sanderson, 113 Pa. 126, definitively settled the rule that for unavoidable damage to another's land, in the lawful use of one's own, no action can be maintained. No other result seems possible, without restricting the uses, derogating from the full enjoyment, and diminishing the value of property. But the rule does not go beyond proper use and unavoidable damage. It is thus clearly expressed in the opinion of our Brother CLARK: "Every man has the right to the natural use and enjoyment of his own property; and if, while lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is damnum absque injuria:" 113 Pa. 146. That this is the rule as to surface streams was conceded by the defendant below; but it contended that as to subterranean waters, or at least as to percolations and hidden streams, an owner was not bound to pay any attention to the effect of his

operations within his own land, upon the land of others. The learned judge below, though seeing and expressing the force of the reasons for a uniform rule applicable to both classes of waters, felt himself so far constrained by adjudicated cases that he directed a verdict for the defendant. We have therefore to examine the cases, to see what the true distinction is between surface, or visible, and subterranean waters, and whether different principles are applicable to the rights in them, respectively, or the same principle, with only such modifications as may be necessary in practical application.

In Wheatley v. Baugh, 25 Pa. 528, the plaintiff had a spring upon his property, which he had used in his tannery for more than twenty-one years, when defendant opened a mine on his adjacent land, and put in a steam-pump to take out the water, with the result of drying up the plaintiff's spring. It was held that plaintiff had no cause of action. This case settled the law on the subject of percolating waters, and has not since been questioned. It was followed in Haldeman v. Bruckhart, 45 Pa. 514, but was re-stated rather narrowly by Justice STRONG, thus: "In that case it was ruled that where a spring depends for its supply upon filtrations or percolations of water through the land of an owner above, and, in the use of the land for mining or other lawful purposes, the spring is destroyed, such owner is not liable for the damages thus caused to the proprietors of the spring, unless the injury was occasioned by malice or negligence. To such percolations or filtrations, then, the inferior owner has no right. This was all that was necessary to the decision of the case." He then criticises the rest of the opinion in Wheatley v. Baugh as dictum, and formulates the rule again in the following terms: "A proprietor of land may, in the proper use of his land for mining, quarrying, building, draining, or any other useful purpose, cut off or divert subterraneous water flowing through it to the land of his neighbor, without any responsibility to that neighbor." These forcible statements of the rule are, as I apprehend, the main ground of the contention on behalf of the defendant in the present case, that an owner is not bound to pay any regard to the effect of his operations on subterranean waters. But this contention overlooks the qualification made in all the cases, that there must be no negligence. The opinion of Chief Justice LEWIS in Wheatley v. Baugh is as able, elab-

orate, and convincing a discussion of the subject as can be found reported, and in it the necessary and unavoidable character of the damage is explicitly insisted on : " When the filtrations are gathered into sufficient volume to have an appreciable value, and to flow in a clearly-defined channel, it is generally possible to see it, and to avoid diverting it without serious detriment to the owner of the land through which it flows.   But percolations spread in every direction through the earth, and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land : "  Page 532.   " The owner of a spring, although his right is imperfect where the supply is derived through his neighbor's land, has nevertheless a privilege subordinate only to the paramount rights of such neighbor ; and it is only when the fair enjoyment of those paramount rights requires its destruction that he is bound to submit to the deprivation : "  Page 535.   And even in Haldeman v. Bruckhart, which is the most strongly expressed of all the decisions in favor of the rights of the proprietor on his own land, it is clear that the same qualification is not lost sight of, although not prominently put forward.   " A surface stream," says STRONG, J., " cannot be diverted without knowledge that the diversion will affect a lower proprietor.   Not so with an unknown subterraneous percolation or stream.   One can hardly have rights upon another's land which are imperceptible, of which neither himself nor that other can have any knowledge . . . . . These appear to us very sufficient reasons for distinguishing between surface and subterraneous streams, and denying to inferior proprietors any right to control the flow of water in unknown subterranean channels upon an adjoiner's land.   They are as applicable to unknown sub-surface streams as they are to filtrations and percolations through small interstices."   And in Lybe's App., 106 Pa. 634, it is said : " The rule is that, wherever the stream is so hidden in the earth that its course is not discoverable from the surface, there can be no such thing as a prescription in favor of an adjacent proprietor to have an uninterrupted flow of such stream through the land of his neighbor." On the other hand, where the subterranean water is not hidden, but has a defined flow, which is known or ascertainable, rights in it will be treated on the same basis as rights in a surface stream :  Whetstone v. Bowser, 29 Pa. 59.

It is therefore clear, from the principles and the reasoning of all the cases, that the distinction between rights in surface and in subterranean waters is not founded on the fact of their location above or below ground, but on the fact of knowledge, actual or reasonably acquirable, of their existence, location, and course. The principle of Penna. Coal Co. v. Sanderson is precisely the same as that of Wheatley v. Baugh, and is of general application. It is, that the use which inflicts the damage must be natural, proper, and free from negligence, and the damage unavoidable. On the question of negligence, the question of knowledge is always important, and may be conclusive. Hence the practical inquiry is, first, whether the damage was necessary and unavoidable; secondly, if not, was it sufficiently obvious to have been foreseen, and also preventable by reasonable care and expenditure? In Penna. Coal Co. v. Sanderson the damage was unavoidable. In Wheatley v. Baugh it was not ascertainable beforehand; hence the plaintiff had no cause of action in either case. Later cases, following Wheatley v. Baugh, have held that injury to springs, wells, etc., supplied by mere percolation, was not actionable, and the reason has always been the same, that the damage could not be foreseen or avoided. If the boundaries of knowledge have been so enlarged as to make an end of the reason, then, cessante ratione, cessat ipsa lex. Geology is a progressive, and now, in many respects, a practical science; and, as truly remarked by the learned judge below, in his opinion on the motion for a new trial, "since the decisions in Acton v. Blundell, and Wheatley v. Baugh, probably more deep wells have been drilled in Western Pennsylvania than had previously been dug in the entire earth in all time. And that which was then held to be necessarily unknown, and merely speculative, as to the flow of water underground, has been, by experience in such cases as this, reduced almost to a certainty." If this is the state of knowledge at the present day; if the existence of a stratum of clear water, and its flow into wells and springs of the vicinity, and the existence of a separate and deeper stratum of salt water, which is likely to rise and mingle with the fresh, when penetrated in boring for oil or gas, are known, and the means of preventing the mixing are available at reasonable expense, then, clearly, it would be a violation of the living

spirit of the law not to recognize the change, and apply the settled and immutable principles of right to the altered conditions of fact. The learned judge, in his charge, said: "There is evidence from which the jury could fairly find that the defendant, when the well was drilled, knew, or ought to have known, if they had exercised any reasonable judgment, or investigated or paid attention to it, that the boring of this well in the way it was done, without shutting off the salt water from the fresh water, would almost inevitably ruin these and other wells in the immediate vicinity. And I think there is evidence from which the jury could fairly find that the defendant could, with the outlay of a small amount of money, have shut off the salt water from the fresh water so that it could not have done any injury." If the jury had found the facts as this charge assumes that they fairly might on the evidence, then the plaintiff had made out a case of negligence, and was entitled to recover. Negligence in this sense is the absence of such care and regard for the rights of others as a prudent and just man would and should have in the same situation. If the plaintiff showed that the injury was plainly to be anticipated, and easily preventable with reasonable care and expense, he brought himself within the exception of all the cases from Wheatley v. Baugh to Penna. Coal Co. v. Sanderson, inclusive.

It may be well to say that, in cases of this nature, juries should be held with a firm hand to real cases of negligence within the exception, and not allowed to pare down the general rule by sympathetic verdicts in cases of loss or hardship from the proper exercise of clear rights. The danger of such result is not to be ignored, but we cannot on that account shut the door to suitors entitled to redress for genuine wrongs. The duty to maintain the line firmly where justice and law put it is, in the first instance and chiefly, upon the trial courts.

Judgment reversed, and venire de novo awarded.