## Swift & Company *vs.* The Peoples Coal & Oil Company et al.

Maltbie, C. J., Hinman, Banks, Brown and John Rufus Booth, Js.

Argued May 3d—decided July 10th, 1936.

*Richardson Bronson,* with whom, on the brief, was *J. Warren Upson,* for the appellant (plaintiff).

*John H. Cassidy,* with whom was *Mitchell G. Meyers,* for the appellees (defendants).

MALTBIE, C. J. The plaintiff carries on a business a portion of which consists of the wholesale storage of

sweet pickled meats in a large brick building situated upon premises owned by it in Waterbury. The building extends to the westerly line of the lot and directly adjacent to it are premises owned by the defendant The Fulton Markets, Incorporated, and occupied by the defendant The Peoples Coal and Oil Company under a lease. In September, 1934, water and oil began to ooze through the floor of two refrigerating rooms in the basement of the plaintiff's building. The defendant Oil Company is engaged in the business of selling oil and gasoline and has upon its premises three tanks for the storage of fuel oil and kerosene of a capacity of 25,000 gallons, 10,000 gallons and 7500 gallons, respectively. The plaintiff brought this action against the two defendants seeking an injunction and damages, the gravamen of its complaint being that the oil coming into its basement was oil of the defendant Oil Company.

The trial court gave judgment for the defendants. Its memorandum of decision gave as its reasons for that decision that the oil of which the plaintiff complains reaches its building through subterranean streams or currents and that the oil business on the defendants' premises had been conducted without negligence, stating that these two facts would of themselves absolve the defendants of any liability to the plaintiff. The rather long finding contains two paragraphs dealing with the question whether the oil came from the premises of the defendants. In one it is stated that the defendants' tanks were filled with oil, measured, sealed and allowed to remain for three days and when unsealed, the oil was measured and the quantity found to be the same as when the tanks were filled, that no oil had leaked out or had been lost. In the other it is stated that the evidence was not preponderating as to the source of the oil; that the land

was low, with a hill to the north on which is located the factory of the Lux Clock Company using oil, a dump where crankcase automobile oil had been deposited in large quantities, and a garage. If these findings stand, they justify the judgment for the defendants, and the correctness of the grounds of decision stated in the trial court's memorandum of decision becomes of no consequence.

As regards the first paragraph, in which it is stated that the tanks upon the defendants' premises had been tested and it had been found that no oil had leaked out or been lost, the witness who made the test stated upon cross-examination that under the method used a tank might have leaked as much as five gallons between the time when it was sealed for the test and when it was unsealed, stated by him to be a lapse of forty-three hours, without the test disclosing that fact. The finding of the trial court that the tanks had been tested and it had been found that no oil had leaked out cannot, therefore, be sustained.

The other paragraph of the finding, to the effect that the evidence was not preponderating as to the source of the oil, has required an extended examination of the evidence, which may be summarized as follows: The oil, beginning in September, 1934, came into the basement of the plaintiff's building at or near the base of the wall adjoining the defendants' premises. The largest of the defendant Oil Company's tanks has been used to store kerosene, the next was used at first for storing No. 2 fuel oil but this was later changed to No. 4, and the third has at all times been used to store No. 4 fuel oil. These tanks are located about fifty feet away from the plaintiff's building. To the northeast of the plaintiff's and defendants' premises the land rises at a sharp slope and the land of the defendants gradually slopes from an area near the oil

tanks toward the westerly wall of the plaintiff's building. The premises of the plaintiff and defendants are located in a low place and water gathers there to such an extent that the water level is usually about a foot below the surface of the ground. That there was a considerable amount of free oil in the ground of the defendants' premises appears clearly not only from the testimony of the plaintiff's witnesses but that of a witness produced by the defendants, who gave evidence that he had dug several holes there and they rapidly filled with water upon the top of which was a scum of oil. Anilin dye placed in a hole four and one-half feet deep sunk near the tanks on the defendants' premises appeared three or four days later in the cellar of the plaintiff's building, thus showing that water, at least, percolated from the land near the tanks into the cellar; an expert witness for the defendants testified, to be sure, that this dye, while it might show the direction in which water percolated, would not necessarily show that the oil percolated in the same direction, but a reading of his testimony indicates that in very large part his opinion was based upon the theory that if the water level on the premises was one foot below the surface of the ground, the oil, which would not mix with the water, would not be found at the depth of the floor of the basement of the plaintiff's building, a theory which is disproved by the fact found by the trial court and all but admitted by the defendants, that oil did in fact come into the floor of the cellar; and the other expert witness called by the defendants stated on cross-examination that the oil would probably follow the same path as the water.

The plaintiff offered the opinion evidence of a sanitary inspector of the city and of a qualified expert that the oil in the cellar did come from the premises of the defendants, and also that of a member of the

sanitary staff of the city who stated that his first conclusion had been to the same effect but later he had come to doubt it principally because the test applied to the defendant Oil Company's tanks showed no leakage of oil, a reason which, as we have stated, does not accord with the defendants' own evidence, and secondly because of the possibility of the oil coming from the factories of the Lux Clock Company, a matter of which we shall speak later. The defendants produced two expert witnesses who testified to the general effect that in their opinion the oil did not come from the defendants' premises, but both of whom admitted that free oil on the defendants' premises might get into the cellar of the plaintiff's building. The Lux Company did own property upon the slope to the northeast of the plaintiff's premises and had two oil tanks, one with a capacity of 5000 gallons and the other 1000 gallons; but the latter had not been put into use when the oil first appeared in the cellar of the plaintiff's building, and the former was about eight hundred feet away, had been subjected to a test for leakage and shown none and had, moreover, been there for some years before the defendants' plant was established. There was testimony, also, that the slope near the Lux Company factory had been used for dumping refuse containing oil, that before the defendants' plant was established the land occupied by it had shown an oily condition, and that there were other possible sources which might have resulted in oil upon the surface of the ground. But these conditions had all been in existence for years before the oil appeared in the plaintiff's cellar and, as causes of that oil, had decreased rather than increased in effect.

The plaintiff offered the expert testimony of a chemist who had made a number of tests of the oil found in the cellar, oil taken from the defendants' tanks and oil

from those of the Lux Company and upon the basis of these tests reached the opinion that the oil from the cellar was substantially similar to that from the defendants' tanks and not to that from the Lux Company tanks and came from the former; and he also testified that the oil might very well take the time between the installation of the defendants' tanks and the time it appeared in the cellar to work its way through the waterproofing of the cellar, evidence which was not in any way disputed. It is true that the defendants countered with the testimony of an expert witness who upon the basis of two tests, one by specific gravity and one by viscosity, of oil taken from the cellar and from the tanks of the defendant Oil Company, testified that the former could not have come from the tanks; but he admitted that the gravity of the oil from the cellar might have been affected by the fact that it had been in contact with waterproofing material; and the chemist for the plaintiff, called in rebuttal, testified that the viscosity test also showed a very large discrepancy in character between the oil from the cellar and that from the tanks of the Lux Company.

Viewing the testimony as a whole, it thus appears that there was in the soil of the defendants' property a considerable amount of oil which might continually be increased by a leakage from its tanks or from spillage in their use, that the contour of the land was such that the oil would naturally percolate to the plaintiff's premises and that other possible sources from which it might come were reasonably eliminated by the fact that, though they had existed for some years before the defendant Oil Company established its plant, they had not caused oil to seep into the cellar. The finding of the trial court that the evidence did not preponderatingly show the source of the oil as com-

ing from the premises of the defendants is not one which the trial court could reasonably reach upon the evidence in the case and must be stricken out.

The correction of the finding as regards the two paragraphs we have discussed destroys the basis of the trial court's conclusions as stated in it and a new trial is necessary unless the court was correct in the conclusions stated in the memorandum of decision, that even though the defendants were responsible for the seepage of oil into the plaintiff's premises, they would not be liable because that oil came there through subterranean streams or currents, and that the business of the defendant Oil Company had at all times been conducted without negligence.

Much of the early law as to the rights of landowners in subterranean waters was built upon the decision of *Acton* v. *Blondell*, 12 M. & W. 348, a case the reasoning of which was adopted and amplified by us in *Roath* v. *Driscoll*, 20 Conn. 533, where we held that a landowner was not liable to another because for his own advantage and without any design unnecessarily to injure that other he made an excavation on his own land which interfered with the rise of water from subterranean sources in a well and reservoir on the latter's property. Briefly, the two reasons given to support the doctrine are, that water percolating through the soil is not distinguishable from the earth itself, "not more than the metallic oxids of which the earth is composed," and that the sources and movements of subterranean waters are so obscure and uncertain and a landowner ordinarily so without knowledge as to the direction in which they may percolate or run that there is no sufficiently definite basis upon which the right of an adjoining landowner to receive the water may fairly be based. There is, however, a strong tendency among the decisions to qualify the absolute

right which a landowner was formerly considered to have to immunity from liability for interference with the percolation or flow of subterranean waters, a tendency suggested, indeed, in *Roath* v. *Driscoll* by the inclusion in the decision of that case of the circumstances that the purpose of the defendant was to serve his own advantage and was without design unnecessarily to injure the plaintiff; and many well considered cases apply to the situation the doctrine of reasonable care. *Bassett* v. *Salisbury Mfg. Co.*, 43 N. H. 569, 573; *Meeker* v. *East Orange*, 77 N. J. L. 623, 87 Atl. 504; 55 A. L. R. 1398, note; 67 C. J. p. 838. The uncertainties which ordinarily exist as to the sources and direction of subterranean water led the Michigan court in an opinion by Cooley, J., to deny liability of a landowner for pollution of a well upon adjoining property by the percolation of water beneath the surface. *Upjohn* v. *Richland Township*, 46 Mich. 542, 548, 9 N. W. 845; see also *Greencastle* v. *Hazelett*, 23 Ind. 186, 189; *Rose* v. *Socony-Vacuum Corporation*, 54 R. I. 411, 173 Atl. 627. The great weight of authority is, however, to the effect that one may be liable to another for causing damage in that manner; 55 A. L. R. 1429, note; 67 C. J. p. 843; and it was so held by us in *Brown & Brothers* v. *Illius*, 27 Conn. 84.

The uncertainties which led to the earlier rule denying to a landowner any right to receive water from adjoining property in its ordinary course present difficulties in the way of establishing an absolute right to receive that water unpolluted by the acts of an adjoining owner, and the courts have stated certain qualifications of that right. One of these is that no liability attaches unless the injury to the adjoining proprietor is under the circumstances naturally to be expected or is known or should have been known in the exercise

of reasonable foresight. *Collins* v. *Chartiers Valley Gas Co.*, 131 Pa. St. 143, 159, 18 Atl. 1012; *Beatrice Gas Co.* v. *Thomas*, 41 Neb. 662, 671, 59 N. W. 925; *Ball* v. *Nye*, 99 Mass. 582. This qualification rests upon sound reason. To deny to a landowner a right to make a certain use of his property because of a mere possibility that the water percolating from it to the land of another may be polluted to the injury of that other would unjustifiably restrict property rights. Unless and until the landowner knows or should know that his use of his land will cause injury to another he should not be fettered in his right to enjoy it.

Some decisions qualify the right of the one who suffers injury from the pollution of subterranean water to recover damages therefor by holding that no liability exists for its pollution unless the person causing that pollution has been negligent in the use of his property. See, for example, *Schlichtkrull* v. *Mellon-Pollock Oil Co.*, 301 Pa. St. 553, 152 Atl. 829. An examination of the decisions suggests, however, that in some of them the court was really addressing itself to the question whether the person charged with the pollution should have known that it was likely to result from his conduct rather than to the inquiry whether there had been a want of reasonable care in the conduct of his business. See, e.g., *Long* v. *Louisville & N. R. Co.*, 128 Ky. 26, 34, 107 S. W. 203. If the pollution of subterranean waters constitutes a nuisance, it has been held to be immaterial whether or not the person responsible has exercised reasonable care in the conduct of his business. *Belvidere Gaslight & Fuel Co.* v. *Jackson*, 81 Ill. App. 424, 429; *Texas Co.* v. *Giddings* (Tex.) 148 S. W. 1142. The latter view accords with the fundamental concepts of negligence and nuisance. A nuisance may grow out of negligence; *Dean* v. *Hershowitz*, 119 Conn. 398, 409, 177 Atl. 262; *Hill* v. *Way*,

117 Conn. 359, 363, 168 Atl. 1; *Hoffman* v. *Bristol,* 113 Conn. 386, 393, 155 Atl. 499; but it may exist where the use a person is making of his property is not in any respect negligent but nevertheless results in damage to his neighbor. *Southern New England Ice Co.* v. *West Hartford,* 114 Conn. 496, 504, 159 Atl. 470; *McFarlane* v. *Niagara Falls,* 247 N. Y. 340, 343, 160 N. E. 391; *Gus Blass Dry Goods Co.* v. *Reinman,* 102 Ark. 287, 295, 143 S. W. 1087; Harper, Torts, § 180; Salmond, Torts (8th Ed.) p. 244. As the percolating of oil into the plaintiff's premises would constitute a nuisance, it was not necessary for it to prove negligence on the part of the defendants.

The finding of the trial court contains several statements as to subterranean currents of water rising west of the defendants' premises and running toward those of the plaintiff and these statements are not attacked by the appeal. For the purpose of disposing of the case we must, therefore, assume that the findings are correct, an assumption which we regret to make because our examination of the record has disclosed no evidence from which, either directly or by inference, the existence of any subterranean currents with defined courses could properly be found. The court evidently based its ruling that the defendants would not be liable if the oil reached the plaintiff's premises by underground streams or currents upon the decision of *Brown & Brothers* v. *Illius,* supra. This case was heard before three judges. STORRS, C. J., wrote the prevailing opinion, in which HINMAN, J., concurred. That opinion made a distinction as to the liability of one who caused noxious substances to come upon the premises of another through the soil, holding that if they came by percolation, he might be liable, but if they came by the agency of subterranean streams or currents, he would not be liable, even upon the ground that he was

negligent in his management of the work which caused the pollution. ELLSWORTH, J., filed a vigorous dissent to the latter conclusion. He pointed out that the cases relied upon in the majority opinion to support the position there taken were cases involving the right of one landowner to avail himself of the water flowing beneath the ground by sinking a well and the like even though thereby he deprived another of the water which would otherwise flow beneath his land, and that these cases concerned the title to subterranean water, not the question of pollution of another's land by substances getting into them; and he effectively placed the basis of liability for a nuisance of such a nature upon the maxim "Sic utere tuo ut alienum non laedas," a maxim the application of which is not controlled by the particular method by which pollution comes upon the land of the injured party. We have found few cases dealing with the validity of the distinction made in the majority opinion between pollution due to water which percolates through the soil and that due to water which runs in underground streams or channels. That opinion was approved in *Dillon* v. *Acme Oil Co.*, 49 Hun (N. Y.) 565, 570. The distinction it made was, however, expressly rejected in *Beatrice Gas Co.* v. *Thomas,* supra, pp. 668, 670; and in other cases seems not to have been considered, as, for example, *Masten* v. *Texas Co.*, 194 N. C. 540, 140 S. E. 89. It is disapproved by an able commentator. 3 Farnham, Waters, p. 2732, note.

In our judgment the distinction is not based upon sound principle. "It is a familiar doctrine, that one must so use his property as not to injure his neighbor; and, because the owner has the right to make an appropriation of all the underground water, and thus prevent its use by another, he has no right to poison it, however innocently, or to contaminate it, so that when

it reaches his neighbor's land it is in such condition as to be unfit for use, either by man or beast. One may be entitled, by contract with his neighbor, to all the water that flows in a stream on the surface that passes through the land of both; and, while he can thus appropriate it, he has no right to pollute the water in such a manner as, when it passes to his neighbor, its use becomes dangerous or unhealthy to his family, or to the beasts on his farm. . . . The owner of land has the same right to the use and enjoyment of the air that is around and over his premises as he has to use and enjoy the water under his ground. He is entitled to the use of what is above the ground as well as that below it; and, still, it will scarcely be insisted that he can poison the atmosphere with noxious odors that reach the dwelling of his neighbor to the injury of the health of himself or family; if not, we see no reason why he should be permitted to so contaminate the water that flows from his land to his neighbor, producing the same results, and still escape liability for the damages sustained." *Kinnaird* v. *Standard Oil Co.*, 89 Ky. 468, 474, 12 S. W. 937. "The right to foul water is not the same as the right to get it; and in my opinion does not depend upon the same principles. Prima facie every man has a right to get from his own land water which is naturally found there, but it frequently happens that he cannot do this without diminishing his neighbour's supply. In such a case the neighbor must submit to the inconvenience. But prima facie no man has a right to use his own land in such a way as to be a nuisance to his neighbour, and whether the nuisance is effected by sending filth on to his neighbour's land, or by putting poisonous matter on his own land and allowing it to escape on his neighbour's land, or whether the nuisance is effected by poisoning the air which the

neighbour breathes, or the water which he drinks, appears to me wholly immaterial." Lindley, Lord Justice, in *Ballard* v. *Tomlinson,* L. R. 29 Ch. Div. 115, 126, overruling *S. C.,* L. R. 26 Ch. Div. 194; see also *Gilmore* v. *Royal Salt Co.,* 84 Kan. 729, 731, 115 Pac. 541; 3 Farnham, Waters, p. 2730. In so far as *Brown & Brothers* v. *Illius* makes a distinction between pollution brought to another's land by subterranean currents and that carried by percolating waters, it must be overruled.

Neither of the reasons given by the trial court in its memorandum of decision as a basis for the judgment for the defendants was correct. It follows that there was error. As regards the defendant The Fulton Markets, Incorporated, a word further may be said. Ordinarily a landlord is not liable for a nuisance created upon premises he has leased where that nuisance did not exist when they were leased or was not a result reasonably to be anticipated from their use for the purpose and in the manner intended. *House* v. *Metcalf,* 27 Conn. 631, 640; *Calway* v. *Schaal & Son, Inc.,* 113 Conn. 586, 592, 155 Atl. 813; *Lufkin* v. *Zane,* 157 Mass. 117, 122, 31 N. E. 757; *Ahearn* v. *Steele,* 115 N. Y. 203, 209, 22 N. E. 193; *Louisville & N. Terminal Co.* v. *Jacobs,* 109 Tenn. 727, 735, 72 So. 954; *Bailey* v. *Kelly,* 86 Kan. 911, 915, 122 Pac. 1027; *Joyce* v. *Martin,* 15 R. I. 558, 559, 10 Atl. 620; *Tedescki* v. *Berger,* 150 Ala. 649, 43 So. 960; 1 Tiffany, Landlord & Tenant, p. 696. The reason for this rule is that, having leased the premises, the landlord ordinarily is without power to control their use. But if a nuisance arises from the use of the premises during the period of the lease he has it within his power to abate that nuisance at the expiration of the period for which they were rented and if, knowing that it exists, he takes no steps to this end but renews the lease, liability then attaches.

*Ingwersen* v. *Rankin,* 47 N. J. L. 18, 22, affirmed 49 N. J. L. 481, 10 Atl. 545; *Lusk* v. *Peck,* 116 N. Y. Sup. 1051, 1055, affirmed 199 N. Y. 546, 93 N. E. 377; *Hill* v. *Norton,* 74 W. Va. 428, 435, 82 S. E. 363; *Fleischner* v. *Citizens Investment Co.,* 25 Ore. 119, 25 Pac. 174; *Dennis* v. *City of Orange,* 110 Cal. App. 16, 203 Pac. 865; 16 R. C. L. 1079; 49 A. L. R. 1418, note. According to the finding the Fulton Markets, Incorporated, made an oral lease of the premises to the Oil Company for one year in April, 1933, and in April, 1934, renewed it for another period of one year. The oil made its appearance in the plaintiff's cellar in September, 1934. This action was brought in January, 1935, and tried in June of that year. In April, 1935, the lease was again renewed for another year, the defendant then having knowledge at least of the claim of the plaintiff through the service of the writ upon it. No right of action against this defendant arose until April, 1935, and as this was after the beginning of the action there could be no recovery in it at law. *Peck* v. *Easton,* 74 Conn. 456, 459, 51 Atl. 134; *Fish* v. *Smith,* 73 Conn. 377, 385, 47 Atl. 711. Whether the plaintiff would be entitled to relief in equity is a matter which has not been argued before us and one which we do not at this time pass upon.

There is error, the judgment is set aside and a new trial ordered.

In this opinion the other judges concurred.