[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF
This is an action for money damages and injunctive relief based generally on the claim that certain petroleum products which leaked out of underground storage tanks on the defendants' property at 323 Park Road in West Hartford, Connecticut before April of 1991 have migrated into and contaminated the subsoil of the plaintiffs' adjoining property at 319 Park Road in West Hartford. The plaintiffs are: George and Constantine Bassilakis, two brothers who at all times relevant to this case have jointly owned the property at 319 Park Road; and George's son Harry Bassilakis, who now leases the property from his father and uncle, where he owns and operates a historic family eating establishment known as the Quaker Diner. The defendants are: Sylvia Sheketoff, S. James Cohen and Abby Cohen, trustees, one or more of whom owned the property at 323 Park Road, in his or her trusteeship capacity, at all times relevant to this case until May 7, 1996; and the Saland Corporation, a Connecticut corporation formerly doing business as Convenient Petroleum Corporation, Automatic Comfort Corporation, American Coal Company, Incorporated, and The American Coal Co., Incorporated, which leased the property from the other defendants until April of 1991, where it owned and operated a gasoline station equipped with the leaking underground storage tank system. CT Page 5338
In February and March of 1996, the case went to trial before a jury in the Hartford Superior Court. On March 13, 1996, after the evidence was substantially completed, the plaintiffs filed a four-count Substituted Complaint ("S.C." or "Complaint"), in which they identified themselves and the defendants as aforesaid, described their respective relationships to the adjoining properties at 319 and 323 Park Road, alleged that leaking petroleum products from the defendants' underground storage tanks at 323 Park Road had begun to contaminate their property at 319 Park Road, and sought the following relief in connection with such contamination on the following grounds: on the First Count, alleging negligence against all defendants, compensatory damages for plaintiffs George and Constantine Bassilakis, for diminution in the value and income-producing potential of their property at 319 Park Road, and compensatory damages for plaintiff Harry Bassilakis, for past and future lost income to his business due to his inability to expand the business as a result of the contamination; on the Second Count, alleging nuisance against all defendants, compensatory damages for all plaintiffs of the types requested in the First Count; on the Third Count, alleging trespass against all defendants, compensatory damages for all plaintiffs of the types requested in the First and Second Counts, plus attorney's fees and "[i]njunctive relief to prevent Defendants from their continued trespass on Plaintiffs' property"; S.C., Statement of Amount In Demand; and on the Fourth Count, alleging recklessness against defendant Saland Corporation only, compensatory damages of the types requested in the First, Second and Third Counts, plus attorney's fees.
At the close of all the evidence, however, the parties agreed that the only claims upon which the jury should be instructed were the plaintiffs' claims for compensatory damages from all defendants on the theory of nuisance, as described in the Second Count of the Complaint, and their claim for attorney's fees against defendant Saland Corporation only on the theory of recklessness, as described in the Fourth Count of the Complaint. The parties agreed that there was no need to instruct the jury on the plaintiffs' claim of negligence, under Count One of their Complaint, because they could not prevail on that claim if they were unable to prevail on their parallel claim of nuisance. Furthermore, the parties agreed that since the Court would be bound to apply the jury's factual findings on the plaintiffs' nuisance and recklessness claims to all common issues of fact arising on their claim for injunctive relief under Count Three of the Complaint, alleging trespass, all proceedings on the latter CT Page 5339 claim would be postponed until after the jury returned its verdict.
On March 20, 1996, the jury returned the following verdicts: a Plaintiff's Verdict for plaintiff Harry Bassilakis against all defendants in the amount of $3220.92; and a Plaintiffs' Verdict for plaintiffs George and Constantine Bassilakis against all defendants in the amount of $56,441.83. As explained by their claim-specific answers to the Court's Jury Interrogatories, the jurors based both of their verdicts solely on the plaintiffs' claim of nuisance.
The Court held a hearing on the plaintiffs' claim for injunctive relief on the theory of trespass on May 10, 1996, three days after the individual defendants sold their entire interest in 323 Park Road to Hall's Market, Incorporated, a Connecticut corporation which was never made a party to this action. The Court hereby issues its decision on that claim.
I
Because the Court is bound to apply the jury's factual findings on the plaintiffs' claims for money damages to all common issues of fact arising on their parallel claim for injunctive relief, it is appropriate, at the outset of this Memorandum, to review and identify those factual findings. In particular, since the jury based its verdicts for the plaintiffs on their claim of nuisance, the Court must ascertain the factual bases of those awards to determine if they affect the defendants' claimed liability for trespass, and/or the propriety, if liability is established, of granting their claim for injunctive relief.
In its charge on the plaintiffs' claim of nuisance, the Court instructed the jury under the rule of Swift Co. v. People'sCoal Oil Co., 121 Conn. 579, 590-92 (1936), that:
 to prove their claim of nuisance against these defendants the plaintiffs need only establish the following [:f]irst, that the defendants' use of their gas station, however innocent or unintentional, actually caused petroleum products to migrate from their property onto the plaintiffs' property [;a]nd second, that such migration of petroleum products onto their property proximately caused them damage in the use or enjoyment of that property.
CT Page 5340
Jury Charge Transcript, pp. 15-16. Based on the evidence presented at trial, which clearly showed that petroleum products from the defendants' underground storage tanks had leaked into the ground beneath the tank bed and formed a plume that began to migrate into the subsoil of the plaintiffs' property, the jurors properly found that both of these elements had been proved by a fair preponderance of the evidence. They thus gave the following answers to the Court's Jury Interrogatories:
Liability for Nuisance
 1. Did Defendants' use of their property cause migration of petroleum products from the Defendants' property to the Plaintiff's property?
 Yes X No ---- ---- (If the answer to question 1 is yes, go on to question 2.)
* * * *
 2. Was this migration of petroleum products a proximate cause of any damages to the Plaintiffs?
 Yes X No ---- ----
Jury Interrogatories, p. 1.
Having thereby concluded that the defendants were liable to the plaintiffs in nuisance, the jurors went on to consider the plaintiffs' specific claims for damages. In each count of their Complaint, including the nuisance count which went to the jury and the trespass count here at issue, the plaintiffs claimed that the defendants' unsafe and unreasonable use of their own property, in such a way as to cause the migration of petroleum products into the subsoil of the plaintiffs' adjoining property, had caused them the following injuries and losses:
 14. As a direct and proximate result [ ] of [such use and its effects], the Plaintiffs, GEORGE BASSILAKIS CT Page 5341 and CONSTANTINE BASSILAKIS, have suffered a substantial and permanent diminution in the value and income-producing potential of their property [at 319 Park Road in West Hartford].
 15. As a further, direct and proximate result thereof, the Plaintiff, HARRY BASSILAKIS, has suffered, and continues to suffer, a substantial loss of income in his business, as a result of the contamination of the inability to expand the Quaker Diner's facilities as planned, due to the contamination of the soil.
Count II, ¶¶ 14-15 (quoting directly from Count I, II ¶¶ 12-13.); Count III, ¶¶ 12-13 (same); Count IV, ¶¶ 12-13 (same).
As supported by the evidence adduced at trial, the foregoing allegations gave rise to five separate claims of damages: first, that plaintiffs George and Constantine Bassilakis had suffered a diminution of the value of their property as a result of its contamination by petroleum products migrating from the defendants' property onto theirs; second, that the plaintiffs had incurred costs for past testing of their property to detect the presence of such migrating contaminants thereon; third, that plaintiff Harry Bassilakis had lost profits in the operation of the Quaker Diner due to his alleged inability to expand the Diner's facilities as a result of the contamination of the soil;fourth, that plaintiff Harry Bassilakis was reasonably likely to suffer damage in the future due to the projected shutdown of the Quaker Diner while the property at 319 Park Road was being remediated; and fifth, that plaintiffs George and Constantine Bassilakis had suffered damage due to their alleged inability to charge a higher rent to plaintiff Harry Bassilakis, which they claimed they would have done, in the absence of contamination, had the Diner been expanded. The plaintiffs' arguments on the foregoing issues were as follows:
George and Constantine Bassilakis first claimed that the defendants' contamination of their property had resulted in a substantial diminution in its fair market value. On this score they initially argued that the proper legal measure of their loss should be the entire projected cost of remediating the property — that is, restoring the property to the condition it was in before the defendants contaminated it — regardless of the relationship between that cost and the property's original fair CT Page 5342 market value. According to the plaintiffs' expert, Dr. George Hoag, such a remediation effort would require, inter alia, the removal of all contaminated soil from the plaintiffs' property and the wholesale replacement of that soil with clean, uncontaminated fill. Dr. Hoag further testified that the total cost of this operation — which was said to require the lifting, moving and closing of the Diner while the removal and replacement of soil took place — would be approximately $435,000.
When, however, this Court ruled, under longstanding Connecticut nuisance law, that damage to real property cannot be measured by the costs of remediation if those costs exceed the property's fair market value prior to the occurrence of the damage; see, e.g., Whitman Hotel Corporation v. Elliott WatrousEngineering Co., 137 Conn. 562, 573 (1951); the plaintiffs argued to the jury that the full extent of their loss should be calculated by subtracting the fair market value of the propertywith contamination on it, which they claimed to be zero, from the fair market value it would have had without contamination, which they claimed to be $380,000.
The plaintiffs based their claim as to their property's valuewithout contamination on it on revenue projections for the Quaker Diner if, as they claim to have planned and intended before April of 1991, its kitchen and storage facilities were expanded to enhance its efficiency and increase the scope and profitability of its operations. The plaintiffs claimed, in particular, that the enlargement of the Diner's kitchen and storage areas would enable its owner, plaintiff Harry Bassilakis, to keep it open for longer hours and more mealtimes, to prepare, store and serve more profitable "special" meals during peak hours of operation, and to launch an aggressive take-out business.
In its contaminated state, however, the plaintiffs claimed that the Diner had been rendered virtually worthless, for it could not be sold in its contaminated state, and it could not be expanded to achieve optimal efficiency and profitability without incurring combined remediation and shutdown costs far in excess of its pre-contamination value. On the basis of such claims and evidence, the plaintiffs claimed that the fair market value of their property had diminished by a full $380,000.
Consistent with the foregoing analysis, all of the plaintiffs' other claims for damages except their claim for past testing costs were based on their alleged inability to expand the CT Page 5343 Quaker Diner's kitchen and storage facilities without a costly, comprehensive cleanup of their property to rid it of contamination. Thus, Harry Bassilakis's claim of damages for lost profits was based on the claim that increased profits could not be generated without the planned expansion, which in turn could not be undertaken unless the property were remediated. Similarly, George and Constantine Bassilakis's claim of damages for lost rents was based on their alleged inability to charge a higher rent to their son and nephew Harry until the Diner became more profitable, which would not happen without without a cleanup and expansion. Finally, Harry Bassilakis's claim of damages due to the projected shutdown of the Quaker Diner during remediation was based on the testimony of Dr. Hoag that such a shutdown would be necessary if the property were remediated in the manner he suggested.
The defendants vigorously disputed the plaintiffs' claims of damages in several ways. First, they argued that the plaintiffs never really planned to expand the Quaker Diner before they learned their property was contaminated, for even if that possibility was ever discussed, they had never done anything to bring it about. Second, they challenged the plaintiff's optimistic projections of increased business and income for the Diner in the event of expansion, claiming that it was utterly unsupported by experience, meaningful market research or other evidence. On this score they argued that even if the plaintiffs actually intended to expand the Diner's kitchen and storage facilities, their claims of increased profits, rents and market value for the Diner and the property were utterly fanciful and unproved. Third, they argued that the property still had a significant market value despite its contamination, for notwithstanding the plaintiffs' dire claims concerning its utility and profitability, the evidence showed that it had stayed open for business and remained profitable ever since the contamination was discovered. Therefore, claimed the defendants, the property's fair market value was at least $160,000, with or without the contamination.
Fourth and finally, the defendants hotly disputed the plaintiffs' claims that remediation of the property was necessary at all, or if indeed it was necessary to permit the Diner' expansion, that it would require the removal and replacement of all the contaminated soil on the property at the cost of $435,000. The levels of contamination on the property had not been shown to make the property uninhabitable, or to place any CT Page 5344 burden on the current operation of the Diner. Indeed, the only reason why any removal of soil from the property could ever be thought necessary be to stop fumes from entering the Diner in the event of excavation below the rear porch to permit expansion — an operation which, claimed the defendants' remediation expert — could easily be carried out with complete success for approximately $50,000. According to that expert, the entire remediation operation would consist of excavating soil from the side of the Diner adjacent to the defendants' property and installing a vapor extraction system in that strategic location. Such a system, claimed the defendants' expert, would stop all possible fumes from migrating petroleum products from entering the air below or inside the Diner.
Against the background of the foregoing evidence and arguments, the Court submitted the plaintiffs' claims of damages to the jury based on the following instructions. As for the plaintiffs' claim that the fair market value of their property had been destroyed due to the defendants' contamination of it, the jurors were told they could decide that claim in either of two ways: first, by independently finding the fair market value of the property, with and without contamination on it, and measuring the difference between them; or second, by equating diminution of the property's fair market value with the cost of restoring it to its pre-contamination condition, provided such cost did not exceed the property's pre-contamination value.
The jurors were instructed that under either method of valuation, they would first have to find indeed the pre-contamination value of the property, which would be the price "a willing buyer would pay a willing seller for the property after fair negotiations, . . . [considering] the actual condition of the property at the time of the evaluation. . . [and] the likely value of the property if put to its highest and best use at the time of the evaluation." "Jury Charge Transcript, p. 2. Then they were told that the "highest and best use" of a property is "the use . . . which would be made [of it] by a prudent investor with the expectation of getting the greatest financial return for his investment, [assuming] it is reasonably probable that the land in question would actually be put to that use by a prudent investor in the near future, and that such use is so reasonably probable as to have an actual effect on the current market value of the property." Id., pp. 20-21.
Turning to the plaintiffs' central argument that the CT Page 5345 pre-contamination fair market value of their property should reflect their planned expansion of the kitchen and storage facilities of the Quaker Diner, the Court then instructed as follows:
 In this case the plaintiffs have presented evidence of the fair market value of their land at 319 Park Road as they claim it would have been in April, 1991, were it not for the contamination. Part of their evidence has described the alleged fair market value of the land without any additional construction upon it, assuming that it was free from contamination. Part of their evidence describes the alleged fair market value of the property with proposed storage and kitchen areas built. Again, assuming that the property was free from contamination. The plaintiffs offered the latter information about the status of the property with the additional construction in an effort to persuade you that the property's true fair market value at that time, in April of 1991, had it not been contaminated, was that of a property about to be expanded, which they insist they would have done by January 1, 1992, had the property not been contaminated. Before you may consider the plaintiffs' proposed expansion of the diner as the basis for increasing the property's fair market value as of 1991, you must first decide whether or not the plaintiffs actually intended to expand the diner's kitchen and storage areas as they claim to have intended. Second, you must decide whether or not the plaintiffs' proposed expansion would probably have increased the diner's business or increased its profitability. Third, you must inquire whether such an expansion, if successful, would probably have affected the price a willing buyer would have paid a willing seller for the property after fair negotiations in 1991. Particularly in April of 1991. Unless, to reiterate, the projected profitability of the expanded diner would in all reasonable probability have had an effect on the market value of the property at that time, it cannot be relied upon as a basis for assessing fair market value at that time.
Id., pp. 21-22. On the basis of that instruction, the jury was permitted, but obviously not required, to take account of the Diner's proposed expansion in setting its pre-contamination fair market value.
The Court then instructed the jury as to the other findings CT Page 5346 they would have to make before they could decide the degree to which the property had diminished in market value. First, it charged that the jurors would have to find the fair market value of the property with contamination on it as of April of 1991. On this score, the Court initially told the jurors they could simply rely on any evidence they found credible and reliable that bore logically on the price a willing buyer would have paid a willing seller for the property as it was at that time. Id., p. 23. Later, however, at the request of the parties, the Court further instructed the jury that if they could not satisfactorily ascertain the post-contamination value of the property based on the evidence presented, but they unanimously agreed that that value was less than the value without contamination, they should return a verdict stating that the post-contamination value was $1 less than the pre-contamination value.
Second, the Court instructed the jury that they must determine "what are the reasonable costs of restoring [the subject] property to its pre-contamination condition." Id.,
p. 23.
Finally, the Court concluded its charge on fair market value by instructing the jury that it must select which valuation method to use in assessing diminution in the fair market value of the plaintiffs' property — the difference between pre- and post-contamination fair market values, if those values had been proved, or the costs of restoring the property to its pre-contamination condition, provided those costs did not exceed the property's pre-contamination fair market value. Id., pp 23-24.
Presented with these issues, the jurors answered the Court's relevant Jury Interrogatories as follows:
Damage or Nuisance
 3. What would the fair market value of the Plaintiffs' property have been in April of 1991 without the Contamination caused by these Defendants?
 $ 160,000 ---------
 4. What was the fair market value of the Plaintiff's property in April of 1991 with the contamination caused by these Defendants?
CT Page 5347
 $ 159,999 --------- 5. What are the reasonable costs of restoring the Plaintiffs' property to the condition it was in prior to its contamination by these Defendants?
 $ 50,000 ---------
 6. What damage did Plaintiffs George and Constantine Bassilakis suffer to the value of their property as a result of its contamination by these Defendants? (If the amount listed on line 5 is greater than the amount listed on line 3, you must award the Plaintiffs damages in an amount representing the difference between the amounts listed on lines 3 and 4. If, however, the the amount listed on line 5 is less than or equal to the amount listed on line 3, you may award the Plaintiffs damages either in the amount listed on line 5 or in an amount representing the difference between the amounts listed on lines 3 and 4.)
 $50,000 ---------
Jury Interrogatories, pp. 2-3.
So finding, the jurors clearly determined that the fair market value of the plaintiffs' property prior to contamination was $160,000, as the defendants had argued, not $380,000, as the plaintiffs had claimed. This determination, however, appears not
to have been based on the belief that the plaintiffs had no real plans to expand the Diner's kitchen and storage facilities, but on the plaintiffs' failure to prove that such an expansion would have increased the Diner's profitability. This is so because instead of accepting the defendants' primary argument that no remediation of the property was required for any purpose, they accepted the defendants' expert's estimate of the total cost of remediation in the event the Diner were expanded.
Finally, it is obvious that the jurors found themselves unable, on the evidence presented, to determine the actual fair market value of the plaintiffs' property in its post-contaminated state. This uncertainty was clearly evidenced by the jurors' CT Page 5348 assignment of a post-contamination value of $159,999 to the property, exactly $1 less than its established pre-contamination value. This finding was fully consistent with the Court's supplemental instruction and with the evidence, for the only valuation testimony to come before the jury was based exclusively on data relating to uncontaminated properties, which afforded the jury no non-speculative basis for a true assessment of the subject property.
Consistent with its finding that the planned expansion of the Diner would have no effect on the Diner's profits, the jurors appropriately and not surprisingly found that plaintiff Harry Bassilakis had not incurred damages for lost profits and that plaintiffs George and Constantine Bassilakis had not incurred damages for lost rents. Finally, consistent with its acceptance of the defendants' expert's estimate of remediation costs for the property in the event it were expanded, the jury found that it was not reasonably probable that plaintiff Harry Bassilakis would incur losses due to the shutdown of his business while the property was being remediated. Unlike the plaintiff's expert, Dr. Hoag, who had testified that the Diner would have to be closed while the property was being remediated, the defendants' expert flatly stated that no shutdown would be required to accomplish the more limited remediation project he prescribed. The jury, which accepted his figure on remediation costs to the penny, was clearly persuaded by his testimony.
II
In their Third Count, seeking injunctive relief to restrain a continuing trespass, the plaintiffs reidentify themselves and the defendants as the parties to this action, redescribe their respective relationships to the properties at 319 and 323 Park Road, then state the following factual basis for their claim:
 8. On or about April 8, 1991, the Plaintiff, HARRY BASSILAKIS, complained to the Connecticut Department of Environmental Protection of the presence of petroleum-type odors on or about the properties, located at 319-323 Park Road in West Hartford.
 9. Subsequent investigation determined that there had been a release of gasoline and/or diesel products into the soil and underground waters beneath the properties located at 319 and 323 Park Road in West Hartford.
CT Page 5349
 10. The source of the gasoline and/or diesel release was the underground storage tank system of the retail gasoline station, located at 323 Park Road in West [H]artford.
 11. Defendants' pollution of Plaintiffs' property is the direct result of an unauthorized and/or wrongful entry and trespass, and they are liable for all damages and injuries caused thereon.
Following the foregoing allegations, which are all adopted verbatim from the first two counts except for paragraph 11, the Third Count concludes with the following restatement of the same two claims of damages which appear in every other count:
 12. As a direct and proximate result [ ] of [the Defendants' pollution of their property], the Plaintiffs, GEORGE BASSILAKIS and CONSTANTINE BASSILAKIS, have suffered a substantial and permanent diminution in the value and income-producing potential of their property [at 319 Park Road in West Hartford].
 13. As a further, direct and proximate result thereof, the Plaintiff, HARRY BASSILAKIS, has suffered, and continues to suffer, a substantial loss of income in his business, as a result of the contamination of the inability to expand the Quaker Diner's facilities as planned, due to the contamination of the soil.
In considering the plaintiffs' claim for injunctive relief under the foregoing allegations, the Court must first decide if and in what respects those allegations state an actionable claim. If they do not, then the plaintiffs' claim must be denied, for it is a matter of axiom that a pleader can be granted no relief not supported by his pleading.
Under our law, it is well established that a
 Trespass is the physical invasion of property. A defendant commits a trespass whether he physically enters the property, causes an object to enter the property, or causes shock waves to damage the property. The unlawful entry need not have been committed through the use of force. . . .
CT Page 5350
 Liability for trespass is based upon the right to absolute control and enjoyment of property. Consequently, any interference with that right, no matter how small or insignificant, necessarily inflicts some damage upon the property owner.
Newman Wildstein, Tort Remedies In Connecticut, § 14-2(a) (Citations omitted). To establish an actionable trespass, a plaintiff must therefore plead and prove: (1) that he had the right to absolute control and enjoyment of a particular property; (2) that the defendant physically invaded that property, either by entering it personally, causing an object to enter it, or causing shock waves to damage it; (3) that such physical invasion of the property was wrongful; and (4) that such wrongful physical invasion of the property interfered, however insignificantly, with the plaintiff's right to absolute control and enjoyment of the property.
In this case, the plaintiffs have pleaded all the essential elements of an actionable trespass. They have alleged that each of them has the right to absolute control and enjoyment of 319 Park Road in West Hartford, George and Constantine Bassilakis as its owners and lessors, and Harry Bassilakis as the lessee of the Quaker Diner. They have also alleged that the defendants physically invaded 319 Park Road by causing petroleum products to migrate into the soil and ground water of that property from leaking underground storage tanks on their own adjoining property. They have further alleged, albeit in conclusory fashion, that such physical invasion was a trespass or a wrongful entry, thus clearly implying and offering to prove that it was uninvited and not made under a valid claim of right. See Champion v. Hartshorne, 9 Conn. 564, 569 (1933) (holding, inter alia, that "[t]he entry of one man upon the lands of another, without his consent, is, prima facie, a trespass, and requires to be justified.") Finally, they have alleged that the wrongful entry by the defendants' contaminants onto their property has substantially impaired their use and enjoyment of their property, specifically, by lessening its profitability as a commercial leasehold and its income-producing potential as a commercial rental property.
Despite the sufficiency of these allegations, as aforesaid, to state an actionable claim of trespass, they cannot support a claim for injunctive relief to halt or restrain that trespass unless they meet two further requirements: first, by alleging and CT Page 5351 offering to prove that the trespass sought to be enjoined is rehearsed or continuing in nature; and second, by pleading facts tending to establish that such repeated or continuing trespass is causing or threatening to cause irreparable harm for which the plaintiffs have no adequate remedy at law. Connecticut Light Power Co. v. Fleetwood, 124 Conn. 386, 390-91 (1938).
A trespass is "continuing" if its physical presence on the plaintiff's land constitutes an ongoing obstruction to or interference with the plaintiff's right to absolute control and enjoyment of the land. A threatened act of trespass is "repeated" if it is reasonably likely to recur, on multiple occasions, in the foreseeable future. A continuing or repeated trespass may properly be enjoined "where there is something particular in thecase, so as to bring the injury under the head of quieting possession, or so as to make out a case of irreparable mischief,
or where the value of an inheritance is put in jeopardy[.]" Smithv. King, 61 Conn. 511, 515 (1892) (Emphasis supplied).
A harm, of course, is "irreparable" if the damage thereby done cannot be made good or restored. Murray v. Egan,28 Conn. Sup. 204, 208 (1969). Thus irreparable harm arises when there exists no legal remedy furnishing full compensation or adequate redress for a wrong done to or sustained by an individual. SeeCity of New London v. Perkins, 87 Conn. 229, 234-35(1913);Gorham v. City of New Haven, 82 Conn. 153, 157; Murray v. Egan,
supra, 28 Conn. Sup. at 208. The injury or wrong complained of must be serious or material, and not adequately reparable by damages at law in that such damages will not restore the complaining party to the position in which he formerly stood. 1 T. Spelling, Injunctions and Other Extraordinary Remedies § 13, at 19 (2d ed. 1901).
For a legal remedy to be "adequate," it must be specific and adapted to securing the relief sought by an individual "`conveniently, effectively, and completely,'" Burchett v.Roncari, 181 Conn. 125, 129 (1980) (quoting Pottetti v. Clifford,146 Conn. 252, 262 (1959)). In cases involving continuing or repeated trespasses, however, our Supreme Court has observed that the adequacy of a legal remedy does not depend only on the sufficiency of available money damages to make full compensation for a proven loss. Trowbridge v. True, 52 Conn. 190, 199 (1884). Instead, it has been said that in such cases,
"[t]he jurisdiction of the court . . . does not depend CT Page 5352 on the value of the property destroyed, but on the question whether its destruction would materially impair the enjoyment of the property as held and occupied at the time of the commission of the trespass.
Id. (quoting High on Injunctions, § 467). Injunctive relief is thus available to halt or restrain a repeated or continuing trespass whenever
 "the acts done, or threatened to be done, would be ruinous or irreparable, or would impair the just enjoyment of the property in the future . . . . It is the nature of the injury, rather than the magnitude of the damage inflicted, which forms the basis of the redress."
Id., (Citations omitted).
The Third Count of the plaintiffs' Complaint may fairly be read to allege a continuing trespass by the defendants on their property due to the continuing presence on their property of those contaminants which migrated onto the property before April of 1991. This is so because the only damage allegedly done to the property by the wrongful entry of the defendants' leaking petroleum products is the contamination of its soil and ground water, and all of the plaintiffs' claimed losses allegedly attributable to such wrongful entry are based exclusively upon the alleged economic effects of such contamination, to wit: plaintiff Harry Bassilakis's claim that he "has suffered, and continues to suffer, a substantial loss of income in his business, as a result of the inability to expand the Quaker Diner's facilities as planned, due to contamination of the soil; S.C., Count III, ¶ 13; and plaintiffs George and Constantine Bassilakis's related claim that they had thereby suffered "a substantial diminution in the value and income-producing potential of their property." Id., Count III, ¶ 12. If and to the extent that the continuing presence of such contamination on the plaintiffs' property "would be ruinous or irreparable, or would impair the just enjoyment of the property in the future[,]"Trowbridge v. True, supra, 52 Conn. at 199, the Court may grant injunctive relief to redress it, as the plaintiffs have requested.
Interestingly, however, there is no allegation in the plaintiffs' Complaint of any likely future, repeated trespass from outside the plaintiffs' property by new contamination CT Page 5353 entering upon it from 323 Park Road. Thus, despite the plaintiffs' efforts to offer proof of such a threat, they do not allege that any contaminants from the defendants' leaking underground storage tanks are still in the ground beneath 323 Park Road, or that any such contaminants are still migrating onto the plaintiffs' adjoining property. Moreover, there is no allegation that any possible migration of off-site contaminants onto the plaintiffs' subject property in any way threatens the plaintiffs' right to absolute control and enjoyment of their property. Hence, though the plaintiffs have partially based their claim for injunctive relief on the putative need to eliminate such a threat, their Complaint cannot support the granting of such relief since the necessary factual predicate is simply not alleged.
An equally significant omission from the plaintiffs' Complaint, under any theory of repeated or continuing trespass, is of any allegation that that trespass, if not restrained or abated, will cause the plaintiffs irreparable harm for which they have no adequate remedy at law. This deficiency, however, was remedied at the hearing on this claim, when the plaintiffs' counsel, taking note of the omission, sought the Court's permission to amend the Complaint to so allege. In the absence of objection by the defendants, the Court continued the hearing as if the plaintiffs' request for leave to amend had been granted, and the parties have fully argued the relevant legal issues without prejudice to their interests. The Court will therefore treat the Complaint as amended to include the allegation that the defendants' alleged trespass is causing the plaintiffs irreparable harm for which they have no adequate remedy at law.
The plaintiffs, as previously noted, have asked this Court to enter injunctive orders of two different types: a mandatory injunction, requiring the defendants to remove all residual contamination from the plaintiffs' property which will not be removed by the limited remediation project which the jury, by its verdict, has compelled the defendants to pay for; and a prohibitory injunction to restrain the defendants from further trespasses upon their property by migrating portions of the plume of contaminants which still lies beneath 323 Park Road. The Court will address each claim separately, though it has already ruled that the latter claim is not supported by the allegations of the Complaint.
The plaintiffs' request for mandatory injunctive relief to CT Page 5354 remove remaining contamination from the plaintiffs' property after the remediation project financed by the jury's verdict is completed can be easily disposed of, for the continuing trespass it seeks to remedy is one for which they have already received a complete, convenient and effective remedy at law. Burchett v.Roncari, 181 Conn. 125, 129 (1980). The only respect in which the plaintiffs claimed and proved that the leaking petroleum from the defendants' underground tank system destroyed the value of their property or impaired their right to use and enjoy it in the future was by preventing them from expanding the Quaker Diner, and thus from realizing the increased profits, rental income and enhanced commercial property value to which the expansion might lead. Logically, then, by awarding the plaintiffs a sum of damages expressly designed to make possible that very expansion, with all of its accompanying benefits fully preserved and protected, the jury fully "restore[d] the [plaintiffs] . . . to the position in which [t]he[y] formerly stood" before their property was contaminated. 1 T. Spelling, Injunctions and OtherExtraordinary Remedies, supra, § 13, at 19 (2d ed. 1901). With contamination removed from the property in the manner contemplated by the defendants' remediation expert, the property would be returned to its pre-contamination state in all functional respects affecting the plaintiffs' right to use and enjoy it. The expansion would permit the property to be put to what all parties agreed was its highest and best use, as an historic family eating establishment. And no contemplated use of the property for that purpose or any other would be compromised or affected by the lingering presence of other quantities of contaminant thereon.
The plaintiffs, in fact, strove mightily during trial to persuade the jurors that without the removal of all contaminated soil from the subject property, the Diner could not be expanded as planned and their claimed losses would continue. However, the jury rejected that claim, finding that all that was necessary "to restor[e] the Plaintiffs' property to the condition it was in prior to its contamination by these Defendants" was the defendants' expert's recommended sum of $50,000. Jury Interrogatories, p. 2.
In sum, these plaintiffs have already had their day in court with respect to their claim that the presence on their property of petroleum products from the defendants' leaking underground storage tanks is continuing to interfere with their absolute right to control and enjoy the property. They have been fully and CT Page 5355 adequately compensated for that interference by the jury's award of money damages on the count of nuisance, for that award permits them to eliminate the only remaining source of such interference — those contaminants in their soil which prevent the expansion of the Quaker Diner. Against this background, the Court has no occasion to issue a mandatory injunction requiring the defendants to engage in or pay for further cleanup of 319 Park Road.
The plaintiffs' parallel claim for a prohibitory injunction, even if somehow provable under the allegations of their Complaint, is also without merit, for the following reasons. First, there is no proof whatsoever on this record of the speed at which contaminants from the lingering plume beneath 323 Park Road are or may be migrating towards the plaintiffs' property, much less the concentrations of such material in the ground water or the projected effects of their presence in the ground water on the plaintiffs' control or enjoyment of their property. It is clear from the evidence presented that any such materials are moving very slowly, influenced by gravity and changes in the water table in the highly impermeable soil. It is also clear that the existing plume of contaminants is not being fed by new leaks from sources of stored petroleum, for the leaking tanks were removed in April of 1991. However, apart from the logical inference that the rate of migration is now slower than when the tanks were leaking and the plume was growing, it would be utterly speculative to project any threat of any type or magnitude to the plaintiffs' property as a result of the continuing migration. There is simply no proven threat, irreparable or otherwise, to the plaintiffs' subject property, much less to the plaintiffs' absolute right to control and enjoy it.
Second, to the extent that the defendants' remediation expert can be understood to have prescribed the installation of a vapor extraction system along the wall of the Quaker Diner adjacent to the defendants' property, towards which the plume of contaminants is claimed to be migrating, the jury, by its verdict, has already fully compensated the plaintiffs for all the protection they will ever need against that plume. The operation of a vapor extraction system in that location would intercept and vaporize all incoming contaminants before they ever had a chance to reach the wall of the Diner, or thus potentially to affect the air quality in and around the Diner. Therefore, since the only alleged threat to the plaintiffs' continuing ability to use and enjoy their property is the threat that incoming contaminants will compromise the Diner's expansion and profitability, the elimination of that threat by CT Page 5356 the vapor extraction system financed by the jury's verdict constitutes an adequate remedy at law that obviates any need for and undermines this Court's power to grant a prohibitory injunction.
The final reason why a prohibitory injunction restraining the future migration of petroleum products from 323 Park Road onto the plaintiffs' adjoining property is that the defendants no longer own or control that property. Even, then, if the Court could find that the threatened migration of those contaminants into the plaintiffs' property would materially impair the plaintiffs' use or enjoyment of their property, it would be hard pressed to fashion an effective injunctive remedy to halt the trespass thereby threatened.
The Court is bound, in exercising its discretion to grant or deny an injunction, to consider the situation presented to it when the injunction is issued, not that which existed when the action arose. Loew's Enterprises, Inc. v. International Allianceof T.S.E., 127 Conn. 415, 419 (1940). "In equitable proceedings, any events occurring after their institution may be pleaded and proved which go to show where the equity of the case lies at the time of the final hearing." Duessel v. Proch, 78 Conn. 343, 350
(1905).
It must be remembered that the only proper purpose of an injunction is to prevent a threatened harm, not to redress a prior grievance. See Roy v. Moore, 85 Conn. 159, 166 (1912). The Court must therefore be mindful, in issuing an injunction, of whether the relief it purports to afford is real or illusory. If the party to whom an injunction is issued lacks the legal right or power to comply with it, or if his efforts at compliance threaten the rights of third parties not before the Court, then the Court should refrain from exercising its power to grant injunctive relief. See generally, 43 C.J.S., Injunctions § 39, wherein the rule is flatly stated as follows: "An injunction will not be issued restraining a defendant from taking certain action unless he is himself the person attempting to take such action or is the person in control thereof."
In this case, if the continuing presence of the plume of contaminants at 323 Park Road threatened imminent harm to the plaintiffs' possession and enjoyment of 319 Park Road, which it does not, the Court could order the defendants, if they still owned or controlled the offending property, to take suitable CT Page 5357 measures to prevent further off-site migration of the plume. Here, however, the record shows that these defendants are no longer in a position to exercise control over the subject premises, and thus they are in no position to enforce any court order affecting activities on that property. The property's owners, it must be added, are not before the Court, and no effort has been made to demonstrate that they purchased the subject property as the agents or alter egos of the defendants. Cf.DeMartino v. Monroe Little League, Inc., 192 Conn. 271, 276
(1984). Here, quite simply, the only injunctive relief this Court could fashion would be unenforceable by the defendants, who are the only persons besides the plaintiffs over whom it has jurisdiction. Though the current owner of 323 Park Road may one day be called to account if any additional contaminants from beneath their property migrate onto the plaintiffs' property and harm their rights to possess and enjoy it, such a claim is not before the Court, and will not be entertained.
III
For all of the foregoing reasons, the Court hereby denies the plaintiffs' claims for mandatory and prohibitory injunctive relief.
HON. MICHAEL R. SHELDON, J.